[No. F057784. Fifth Dist. Sept. 1, 2011.]

HOLLY STINNETT, Plaintiff and Appellant, v.
TONY TAM et al., Defendants and Respondents.

**1416**

**COUNSEL**

Tabak Law Firm, Stewart M. Tabak; Smith & McGinty, Law Office of Daniel U. Smith, Daniel U. Smith and Valerie T. McGinty for Plaintiff and Appellant.

The Arkin Law Firm, Sharon J. Arkin, Robert S. Peck; Center for Constitutional Litigation and Ned Miltenberg for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Offices of Mark Peacock and Mark J. Peacock for AARP, California Nurses Association, Consumer Action, CDCAN, California Foundation for Independent Living Centers, California Alliance for Retired Americans, Consumer Federation of California, United Policyholders, Congress of California Seniors, California Advocates for Nursing Home Reform, Center for Public Interest Law, Children's Advocacy Institute and Consumer Watchdog as Amici Curiae on behalf of Plaintiff and Appellant.

Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza, Ashfaq G. Chowdhury; Donnelly Nelson Depolo & Murray and James M. Nelson for Defendants and Respondents.

Fred J. Hiestand for Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

Tucker Ellis & West, E. Todd Chayet and Rebecca A. Lefler for California Medical Association, California Dental Association, California Hospital Association and American Medical Association as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**GOMES, J.**—In 1975, the Governor convened the California Legislature in an extraordinary session to consider measures aimed at remedying what he described as "serious problems that had arisen throughout the state as a result of a rapid increase in medical malpractice insurance premiums." (*American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 363 [204 Cal.Rptr. 671, 683 P.2d 670] (*American Bank*).) As a result, the Legislature enacted the Medical Injury Compensation Reform Act of 1975 (MICRA) (Stats. 1975, 2d Ex. Sess. 1975–1976, chs. 1 & 2, pp. 3949–4007), which our Supreme Court characterized as "a lengthy statute which attacked the problem on several fronts." (*American Bank, supra,* 36 Cal.3d at p. 363.) "In broad outline, the act (1) attempted to reduce the incidence and severity of medical malpractice injuries by strengthening governmental oversight of the education, licensing and discipline of physicians and health care providers, (2) sought to curtail unwarranted insurance premium increases by authorizing alternative insurance coverage programs and by establishing new procedures to review substantial rate increases, and (3) attempted to reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation." (*Id.* at pp. 363–364.)

This case involves a provision of MICRA which limits the recovery of so-called "noneconomic" damages to a maximum of $250,000 in any action against a health care provider based on professional negligence. The statute, Civil Code section 3333.2,[1] states in pertinent part: "(a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage. [¶] (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)."

Appellant Holly Stinnett sued, among others, respondents Tony Tam, M.D., and Modesto Surgical Associates for the wrongful death of her husband, Stanley Stinnett, due to professional negligence. The trial court reduced the jury's $6 million noneconomic damage award to Stinnett to $250,000 pursuant to a defense motion made under section 3333.2. On appeal, Stinnett contends the reduction of her noneconomic damages constituted (1) a violation of her right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution and by article I, section 7, subdivision (a) of the California Constitution and (2) a violation of her right to a jury trial under article I, section 16 of the California Constitution.

---

[1] All further statutory references are to the Civil Code unless otherwise stated.

As we shall explain, we find these contentions to be without merit and therefore will affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORIES

Stinnett brought this action for professional negligence against defendants Memorial Medical Center of Modesto, Memorial Hospital Foundation of Stanislaus County, Modesto Surgical Associates (Modesto Surgical) and Dr. Tony Tam. The complaint alleged that Stinnett's husband, Stanley Stinnett, died on January 11, 2006, as a result of defendants' negligence, carelessness and otherwise wrongful medical care, treatment and diagnosis. Before trial, defendant Memorial Medical Center of Modesto settled with Stinnett for $175,000. At trial, the jury was instructed that Dr. Tam was a partner of Modesto Surgical Associates, and if the jury found Dr. Tam was acting within the scope of his agency when the incident occurred, Modesto Surgical was responsible for any harm caused by Dr. Tam's negligence.

An 11-day jury trial resulted in a special verdict finding Dr. Tam and Modesto Surgical "negligent in the diagnosis and/or treatment of Stanley Stinnett" and that their negligence was a substantial factor in causing his death. The jury awarded Stinnett $148,302 in past economic loss, $1,242,093 as the present cash value of her future economic losses, and $6 million in "[n]on-economic damages for the loss of love, companionship, comfort, care, assistance, protection, affection, society and moral support of decedent Stanley Stinnett."

After the jury verdict, Dr. Tam and Modesto Surgical, by and through their professional liability carrier, paid Stinnett $1,510,036.27 in partial satisfaction of the jury's award of economic damages, with the final amount of economic damages to be adjusted later after determination of the credit/setoff resulting from Memorial Medical Center's pretrial settlement.

Dr. Tam and Modesto Surgical moved to reduce the amount of noneconomic damages to $250,000 pursuant to section 3333.2, and apply the payments previously made to Stinnett as an offset. Stinnett opposed the motion, arguing section 3333.2 is unconstitutional because it conflicts with the constitutional guarantee of equal protection under both the California and federal Constitutions. Specifically, Stinnett argued that while the California Supreme Court upheld the constitutionality of the MICRA cap on noneconomic damages in *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137 [211 Cal.Rptr. 368, 695 P.2d 665] (*Fein*), the cap is now unconstitutional since the "classification incorporated in the MICRA cap has lost its rationality," as the medical malpractice insurance crisis that precipitated the adoption of the MICRA cap in 1975 "has long since ceased to exist," and the cap operates more harshly than in 1975 since it does not adjust for inflation.

In support of her argument, Stinnett submitted a declaration from Missouri lawyer Jay Angoff, who has "been particularly heavily involved with the medical malpractice insurance industry" and co-authored Proposition 103, the insurance reform initiative California voters enacted in 1988. According to Angoff: (1) while courts commenting on MICRA in the past had noted when the statute was enacted malpractice insurance rates were increasing, few firms were writing malpractice coverage, malpractice insurance claims payments were increasing and malpractice insurers were losing money, in 2008 malpractice insurance rates were declining, dozens of traditional and nontraditional malpractice insurers were writing coverage, new carriers were entering the industry, claims payments were decreasing and malpractice insurance profits had been excessive for at least a decade; (2) while eliminating the MICRA cap on noneconomic damages would increase malpractice claims costs, "eliminating the cap should not have a material effect on rates, since California malpractice insurers would still have been able to earn at least an adequate profit for the last ten years had the cap not existed, and would continue to be able to earn such a profit if the cap were eliminated today"; and (3) data from states that have not limited noneconomic damages indicate that malpractice insurers have been able to prosper in such states. Stinnett also submitted the declaration of economist Phillip H. Allman, who stated that inflation had eroded the value of $250,000 in 1975 to a present value in 2008 of approximately $58,857. In their reply, Dr. Tam and Modesto Surgical argued section 3333.2 is constitutional and filed objections to Angoff's declaration.

Following oral argument, the trial court granted the motion in part and denied it in part. The trial court found that MICRA is not unconstitutional, but that Dr. Tam and Modesto Surgical had improperly computed the applicable credit for the settlement by another defendant.

## DISCUSSION

*Legal Background*

After MICRA's enactment, judicial challenges to various provisions of MICRA were abundant, but unsuccessful. In the first of these, *American Bank*, our Supreme Court upheld a provision of MICRA, Code of Civil Procedure section 667.7, against various constitutional claims, including that the provision violates due process, equal protection and the constitutional right to a jury trial. The statute at issue provides that compensation to a plaintiff who recovers future damages of $50,000 or more is to be paid periodically over the course of time the plaintiff incurs the losses rather than in a lump-sum payment. (*American Bank, supra*, 36 Cal.3d 359, 364.)

In rejecting the claim that the statute violated medical malpractice victims' due process rights by diminishing the value of their malpractice actions without providing an adequate quid pro quo, the court explained that "it is both unnecessary and inappropriate for us to attempt to balance the relative benefits and detriments of the legislation—i.e. the 'adequacy' of the quid pro quo—in determining its validity under the due process clause. It is well established that a plaintiff has no vested property right in a particular measure of damages, and that the Legislature possesses broad authority to modify the scope and nature of such damages. [Citations.] Since the demise of the substantive due process analysis of *Lochner* v. *New York* (1905) 198 U.S. 45 [49 L.Ed. 937, 25 S.Ct. 539], it has been clear that the constitutionality of measures affecting such economic rights under the due process clause does not depend on a judicial assessment of the justifications for the legislation or of the wisdom or fairness of the enactment. So long as the measure is rationally related to a legitimate state interest, policy determinations as to the need for, and desirability of, the enactment are for the Legislature." (*American Bank, supra*, 36 Cal.3d at pp. 368–369.)

The court concluded the provision was rationally related to the legitimate state interest of furthering the "fundamental goal of matching losses with compensation by helping to ensure that money paid to an injured plaintiff will in fact be available when the plaintiff incurs the anticipated expenses or losses in the future." (*American Bank, supra*, 36 Cal.3d at p. 369.) In addition, the court noted the Legislature could legitimately determine limiting a defendant's obligation to those future damages a plaintiff actually incurs would serve the public interest, as it would eliminate any windfall a plaintiff's heirs might obtain when they inherit a portion of a lump-sum judgment intended to compensate the injured person for losses he never sustained. (*Ibid.*)

The court also rejected the claim that Code of Civil Procedure section 667.7 denied equal protection by limiting its operation to medical malpractice cases. (*American Bank, supra*, 36 Cal.3d at pp. 370–371.) The court explained the Legislature limited section 667.7's application, and MICRA in general, to the medical malpractice field "because it was responding to an insurance 'crisis' that had arisen in a particular area. The problem which was the immediate impetus to the enactment of MICRA arose when the insurance companies which issued virtually all of the medical malpractice insurance policies in California determined that the costs of affording such coverage were so high that they would no longer continue to provide such coverage as they had in the past. Some of the insurers withdrew from the medical malpractice field entirely, while others raised the premiums which they charged to doctors and hospitals to what were frequently referred to as 'skyrocketing' rates. As a consequence, many doctors decided either to stop providing medical care with respect to certain high risk procedures or treatment, to terminate their

practice in this state altogether, or to 'go bare,' i.e., to practice without malpractice insurance. The result was that in parts of the state medical care was not fully available, and patients who were treated by uninsured doctors faced the prospect of obtaining only unenforceable judgments if they should suffer serious injury as a result of malpractice." (*American Bank, supra*, 36 Cal.3d at p. 371.)

While the plaintiff and supporting amici curiae challenged the factual accuracy of some of the explanations for the crisis, and invited the court to determine the "true" cause of the medical malpractice insurance problems that preceded MICRA and even to second-guess the Legislature as to whether a "crisis" actually existed, the court declined to do so. (*American Bank, supra*, 36 Cal.3d at pp. 371–372.) As the court explained: "It is not the judiciary's function, however, to reweigh the 'legislative facts' underlying a legislative enactment. [Citation.] Whatever the reasons for the medical malpractice insurance problems, it is clear that the Legislature—which thoroughly investigated this matter through numerous hearings, audits and the like—could rationally conclude from the information before it that the high insurance costs in this particular area posed special problems with respect to the continued availability of adequate insurance coverage and adequate medical care and could fashion remedies—directed to the medical malpractice context—to meet these problems." (*Id.* at p. 372.)

The court stated that the Legislature intended Code of Civil Procedure section 667.7, in part, to reduce the cost of medical malpractice insurance in the hope of restoring insurance premiums to a level doctors and hospitals could afford, thereby inducing them to resume providing medical care to all segments of the community, and to ensure that insurance would be available as a protection for patients injured through medical malpractice. (*American Bank, supra*, 36 Cal.3d at p. 372.) The court noted the plaintiff could not claim the statute's provisions are not rationally related to the objective of reducing insurance costs, as the adoption of a periodic payment procedure permits insurers to retain fewer liquid reserves and increase investments, thereby reducing the costs to insurers and insureds. (*Id.* at pp. 372–373.) The court concluded that since there was a rational and legitimate basis for the Legislature's decision to attempt to reduce medical malpractice insurance costs and section 667.7 is rationally related to that objective, the Legislature did not violate equal protection principles in limiting the statute's application to medical malpractice actions. (*American Bank, supra*, 36 Cal.3d at p. 373.)

Finally, the court addressed the argument a number of amici curiae made that MICRA was enacted primarily to contain overall medical care costs and therefore should be held unconstitutional on the basis of statistics which indicated the overall costs of medical and hospital care had risen considerably

in the years since MICRA's enactment. (*American Bank, supra*, 36 Cal.3d at p. 373.) The court concluded the argument was flawed because (1) MICRA's legislative history does not suggest the Legislature intended to hold down the overall costs of medical care, but instead hoped to reduce the cost of medical malpractice insurance, which the statistics suggested had been successful, and (2) the rise in medical and hospital costs cannot properly be attributed to a failure of Code of Civil Procedure section 667.7, since it had never been fully implemented. (*American Bank, supra*, 36 Cal.3d at pp. 373–374.) Moreover, as the court explained: "Finally, and most fundamentally, the constitutionality of a measure under the equal protection clause does not depend on a court's assessment of the empirical success or failure of the measure's provisions. As Justice Brennan explained recently in *Minnesota* v. *Cloverleaf Creamery Co.* [(1981)] 449 U.S. 456 [66 L.Ed. 2d 659, 101 S.Ct. 715]: 'Whether *in fact* the Act will promote [the legislative objectives] is not the question: the Equal Protection Clause is satisfied by our conclusion that the [state] Legislature *could rationally have decided* that [it] . . . might [do so] . . . .' (Original italics.) As we have explained, there can be no question but that—from the information before it—the Legislature could rationally have decided that the enactment might serve its insurance cost reduction objective. Amici's argument is misguided." (*American Bank, supra*, 36 Cal.3d at p. 374.)

With respect to the claim that Code of Civil Procedure section 667.7 violated the constitutional right to a jury trial, the court concluded the section should be interpreted to require the jury to designate the portion of its verdict intended to compensate the plaintiff for future damages and once that designation is made, the court's authority to fashion the details of a periodic payment schedule does not infringe on the constitutional right to a jury trial. (*American Bank, supra*, 36 Cal.3d at pp. 376–377.)

In the next decision, *Barme v. Wood* (1984) 37 Cal.3d 174 [207 Cal.Rptr. 816, 689 P.2d 446] (*Barme*), our Supreme Court rejected due process and equal protection challenges to section 3333.1, subdivision (b), which bars a "collateral source" from obtaining reimbursement of medical expenses or benefits provided to a medical malpractice plaintiff from a medical malpractice defendant. (*Barme, supra*, 37 Cal.3d at p. 177.) The court reasoned that like the periodic payment of damages provision at issue in *American Bank*, the collateral source provision was intended to reduce the cost of medical malpractice insurance and the Legislature could properly determine, in light of the facts before it, that the public interest of the state could be served by adopting measures to reduce such costs. (*Barme, supra*, 37 Cal.3d at pp. 179, 180.) The court concluded section 3333.1, subdivision (b) is rationally related to the objective of reducing the cost of medical malpractice insurance. (*Barme, supra*, 37 Cal.3d at p. 180.) The court further concluded the statute did not deny equal protection because, as explained in *American Bank*, the statutory changes were limited to medical malpractice actions due to the medical

malpractice insurance crisis which precipitated MICRA, and section 3333.1, subdivision (b) was intended to alleviate the same problems. (*Barme, supra*, 37 Cal.3d at pp. 181–182.)

In *Roa v. Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920 [211 Cal.Rptr. 77, 695 P.2d 164] (*Roa*), the court rejected arguments that Business and Professions Code section 6146, which limits the fees an attorney representing a party in a medical malpractice action may obtain on a contingency fee basis, denied due process and equal protection. (*Roa, supra*, 37 Cal.3d at p. 923.) With respect to the equal protection claim, in which the plaintiffs asserted the Legislature acted arbitrarily in selectively imposing attorney fee limits only in medical malpractice actions because such limits would not reduce defense costs, the court stated it could not agree that such limits bore no rational relationship to MICRA's objectives. (*Roa, supra*, 37 Cal.3d at pp. 930–931.) The court concluded the Legislature could have determined the provision would reduce malpractice insurance costs (1) through the large number of malpractice cases that are resolved through settlement, and (2) as a means of deterring attorneys from instituting frivolous suits or encouraging their clients to hold out for unrealistically high settlements. (*Roa, supra*, 37 Cal.3d at p. 931.) In addition, the court concluded the limits are rationally related to the MICRA scheme because MICRA incorporates a number of provisions that place special limits on, or at least may reduce, a malpractice plaintiff's recovery that are not applicable to other personal injury plaintiffs, and the Legislature reasonably may have concluded that a limitation on contingency fees was an appropriate means of protecting the already diminished compensation of such plaintiffs from further reduction by high contingency fees. (*Roa, supra*, 37 Cal.3d at p. 932.)

Finally, in *Fein, supra*, 38 Cal.3d 137, our Supreme Court determined the section at issue here, section 3333.2, does not violate constitutional guarantees of due process and equal protection. In rejecting the argument that section 3333.2 denies due process because it limits the potential recovery of medical malpractice plaintiffs without providing an adequate quid pro quo, the court pointed to the explanation in *American Bank* that a plaintiff does not have a vested property right in a particular measure of damages, therefore the Legislature has broad authority to modify the scope and nature of such damages, and as long as an enactment affecting economic rights is rationally related to a legitimate state interest, it is for the Legislature to determine the need for, and desirability of, the enactment. (*Fein, supra*, 38 Cal.3d at pp. 157–158.) The court noted "the Legislature retains broad control over *the measure*, as well as *the timing*, of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and that the Legislature may expand or limit recoverable damages so long as its action is rationally related to a legitimate state interest." (*Fein, supra*, 38 Cal.3d at p. 158, original italics.)

The court concluded that section 3333.2 is rationally related to legitimate state interests: "in enacting MICRA the Legislature was acting in a situation in which it had found that the rising cost of medical malpractice insurance was posing serious problems for the health care system in California, threatening to curtail the availability of medical care in some parts of the state and creating the very real possibility that many doctors would practice without insurance, leaving patients who might be injured by such doctors with the prospect of uncollectible judgments. In attempting to reduce the cost of medical malpractice insurance in MICRA, the Legislature enacted a variety of provisions affecting doctors, insurance companies and malpractice plaintiffs. [¶] Section 3333.2, like the sections involved in *American Bank, Barme* and *Roa*, is, of course, one of the provisions which made changes in existing tort rules in an attempt to reduce the cost of medical malpractice litigation, and thereby restrain the increase in medical malpractice insurance premiums. It appears obvious that this section—by placing a ceiling of $250,000 on the recovery of noneconomic damages—is rationally related to the objective of reducing the costs of malpractice defendants and their insurers." (*Fein, supra*, 38 Cal.3d at pp. 158–159.)

The court recognized that in some cases section 3333.2 would result in the recovery of a lower judgment than would have been obtained before the statute's enactment, but noted that in seeking a means to lower malpractice costs, the Legislature did not limit a plaintiff's right to recover for all economic, pecuniary damages resulting from the injury, but instead confined the statutory limitations to the recovery of noneconomic damages. (*Fein, supra*, 38 Cal.3d at p. 159.) The court explained that "[t]houghtful jurists and legal scholars" had raised serious questions regarding the wisdom of awarding damages for pain and suffering in any negligence case and while the general propriety of such damages is firmly imbedded in our common law jurisprudence, "no California case of which we are aware has ever suggested that the right to recover for such noneconomic injuries is constitutionally immune from legislative limitation or revision." (*Fein, supra*, 38 Cal.3d at pp. 159–160.) The court concluded: "Faced with the prospect that, in the absence of some cost reduction, medical malpractice plaintiffs might as a realistic matter have difficulty collecting judgments for *any* of their damages—pecuniary as well as nonpecuniary—the Legislature concluded that it was in the public interest to attempt to obtain some cost savings by limiting noneconomic damages. Although reasonable persons can certainly disagree as to the wisdom of this provision, we cannot say that it is not rationally related to a legitimate state interest." (*Fein, supra*, 38 Cal.3d at p. 160, fns. omitted.)

The court also rejected the argument that section 3333.2 violates the equal protection clause because it impermissibly discriminates (1) between medical malpractice victims and other tort victims by imposing limits only in medical malpractice cases, and (2) within the class of medical malpractice victims by

denying a complete recovery of damages only to those malpractice plaintiffs with noneconomic damages exceeding $250,000. (*Fein, supra*, 38 Cal.3d at p. 161.)

With respect to the first contention, the court explained "it should be evident from what we have already said that the Legislature limited the application of section 3333.2 to medical malpractice cases because it was responding to an insurance 'crisis' in that particular area and that the statute is rationally related to the legislative purpose. *American Bank, Barme* and *Roa* make clear that under these circumstances, plaintiff's initial equal protection claim has no merit." (*Fein, supra*, 38 Cal.3d at p. 162.)

In rejecting the second contention, the court explained the Legislature clearly had a reasonable basis for drawing a distinction between economic and noneconomic damages, providing for cost savings through limiting the recovery of noneconomic damages. (*Fein, supra*, 38 Cal.3d at p. 162.) Moreover, the statute was not unconstitutional because the Legislature could have realized its hoped-for cost savings in another manner, such as by mandating a fixed-percentage reduction of all noneconomic damage awards, since "[t]he choice between reasonable alternative methods for achieving a given objective is generally for the Legislature, and there are a number of reasons why the Legislature may have made the choice it did." (*Fein, supra*, 38 Cal.3d at pp. 162–163.) Those reasons, which provide a sufficient rationale for the $250,000 limit, include (1) providing a more stable base on which to calculate insurance rates by imposing an across-the-board limit, (2) promoting settlements by eliminating the unknown possibility of phenomenal pain and suffering awards, or (3) bringing fairness to malpractice plaintiffs in general by reducing only the very large noneconomic damage awards, rather than diminishing the more modest recoveries in the majority of the cases. (*Ibid.*)

In addressing the dissent's concerns, the court stated its application of equal protection principles in *American Bank, Barme, Roa* and *Fein* was not inconsistent with the principles enunciated in *Brown v. Merlo* (1973) 8 Cal.3d 855 [106 Cal.Rptr. 388, 506 P.2d 212] (*Brown*) and *Cooper v. Bray* (1978) 21 Cal.3d 841 [148 Cal.Rptr. 148, 582 P.2d 604] (*Cooper*). (*Fein, supra*, 38 Cal.3d at p. 163.) The court stated: "As *Cooper* explains, under the traditional, rational relationship equal protection standard, what is required is that the court 'conduct "*a serious and genuine judicial inquiry* into the correspondence between the classification and the legislative goals." ' (21 Cal.3d at p. 848 . . . .) We have conducted such an inquiry in all of these cases, and have found that the statutory classifications are rationally related to the 'realistically conceivable legislative [purposes]' (*Cooper, supra*, 21 Cal.3d at p. 851) of MICRA. We have not invented fictitious purposes that could not

have been within the contemplation of the Legislature (see *Brown* v. *Merlo, supra,* 8 Cal.3d at p. 865, fn. 7) nor ignored the disparity in treatment which the statute in realistic terms imposes. (*Id.* at p. 862.) But *Brown* and *Cooper* have never been interpreted to mean that we may properly strike down a statute simply because we disagree with the wisdom of the law or because we believe that there is a fairer method for dealing with the problem. [Citation.] Our recent decisions do not reflect our support for the challenged provisions of MICRA as a matter of policy, but simply our conclusion that under established constitutional principles the Legislature had the authority to adopt such measures. As Justice Traynor explained in *Werner* v. *Southern Cal. etc. Newspapers* [(1950)] 35 Cal.2d 121, 129 [216 P.2d 825]: '[A] court cannot eliminate measures which do not happen to suit its tastes if it seeks to maintain a democratic system. The forum for the correction of ill-considered legislation is a responsive legislature.' " (*Fein, supra,* 38 Cal.3d at pp. 163–164.)

### *Equal Protection*

■ The Fourteenth Amendment to the United States Constitution states in pertinent part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The United States Supreme Court, of course, has recognized that a legislature could not legislate at all if it could not draw classifications and treat one class of persons (the class to which the legislation pertains) differently from others. "When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. See, *e.g., Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U.S. 356 [35 L.Ed.2d 251, 93 S.Ct. 1001] (1973). Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. Legislatures may implement their program step by step, *Katzenbach* v. *Morgan,* 384 U.S. 641 [16 L.Ed.2d 828, 86 S.Ct. 1717] (1966), in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations. See, *e.g., Williamson* v. *Lee Optical Co.,* 348 U.S. 483, 488–489 [99 L.Ed. 563, 75 S.Ct. 461] (1955). In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines, see, *e.g., Day-Brite Lighting, Inc.* v. *Missouri,* 342 U.S. 421, 423 [96 L.Ed. 469 469, 72 S.Ct. 405] (1952); in the local economic sphere, it is only the invidious discrimination,

the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment. See, *e.g.*, *Ferguson v. Skrupa*, 372 U.S. 726, 732 [10 L.Ed.2d 93, 83 S.Ct. 1028] (1963)." (*New Orleans v. Dukes* (1976) 427 U.S. 297, 303–304 [49 L.Ed.2d 511, 96 S.Ct. 2513] (*City of New Orleans*).)

    While parties challenging legislation under the equal protection clause may introduce evidence supporting their claim that the legislation is irrational, they cannot prevail if it is evident that " 'the question is at least debatable.' " (*Minnesota v. Clover Leaf Creamery Co., supra,* 449 U.S. at p. 464.) "Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." (*Ibid.*) The rational basis "standard of review is a paradigm of judicial restraint. 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' " (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 314 [124 L.Ed.2d 211, 113 S.Ct. 2096].) Accordingly, those attacking the rationality of the legislative classification have the burden of negating every conceivable basis which might support it. (*Id.* at p. 315.) Moreover, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. [Citations.] ' "Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." ' " (*Ibid.*; see also *Heller v. Doe* (1993) 509 U.S. 312, 319 [125 L.Ed.2d 257, 113 S.Ct. 2637].)

    Here, Stinnett challenges section 3333.2 on the ground that it deprives her of equal protection of the laws. While Stinnett recognizes that our Supreme Court already found in *Fein* that the statute does not violate equal protection and had a rational basis when passed, she claims that because California is no longer suffering from a malpractice insurance crisis, changed circumstances have so undermined the rationality of section 3333.2's classification that it no longer passes constitutional muster. In support of this claim, Stinnett presents what she asserts is undisputed evidence that a crisis no longer exists, as malpractice insurance rates are not "skyrocketing" and do not threaten the availability of health care, and claims that MICRA is no longer needed because under Proposition 103, the California Insurance Commissioner now

sets medical malpractice insurance rates. Moreover, Stinnett asserts there is no rational basis for a cap that has depreciated from $250,000 in 1975 to $58,857 in 2008 dollars.[2]

■ Generally, modification or repeal of a statute made obsolete by virtue of changed conditions is a legislative, not a judicial, prerogative. (*San Diego County Water Authority v. Metropolitan Water Dist.* (2004) 117 Cal.App.4th 13, 29 [11 Cal.Rptr.3d 446]; see *Naismith Dental Corp. v. Board of Dental Examiners* (1977) 68 Cal.App.3d 253, 263 [137 Cal.Rptr. 133].) The California Supreme Court stated this rule clearly in *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 63 [195 P.2d 1]: " '[I]n the absence of a constitutional objection it is generally held that the courts have no right to declare a statute obsolete by reason of a supervening change in the conditions under which it was enacted.' "

■ Stinnett, however, contends that changed conditions have rendered section 3333.2 unconstitutional since *Fein* was decided in 1985. The principle of changed circumstances is stated in *Chastleton Corp. v. Sinclair* (1924) 264 U.S. 543 [68 L.Ed. 841, 44 S.Ct. 405] (*Chastleton*) as follows: "A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed." (*Chastleton, supra*, at pp. 547–548.) Thus, " 'the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist.' " (*Brown, supra*, 8 Cal.3d at p. 869, quoting *Milnot Co. v. Richardson* (S.D.Ill. 1972) 350 F.Supp. 221, 224; see also *U.S. v. Carolene Products Co.* (1938) 304 U.S. 144, 153 [82 L.Ed. 1234, 58 S.Ct. 778].)

Stinnett contends the principle of changed circumstances applies here, thereby allowing us to reevaluate the constitutionality of section 3333.2. Stinnett asserts our Supreme Court concluded the cap on noneconomic damages "had a 'rational basis' because of the 1975 medical malpractice insurance crisis that threatened the availability of health care," and since medical malpractice insurance is no longer in crisis and poses no threat today

---

[2] In a request filed June 21, 2010, Stinnett asked us to take judicial notice of the following documents: (1) a decision of the California Insurance Commissioner in *In re Matter of Rate Application of American Healthcare Indemnity Co. and SCPIE Indemnity Co.* (2003) file No. PA-02025379, which she claims is an example of Proposition 103's effectiveness in keeping medical malpractice insurance rates at affordable levels, and (2) a two-page 2009 Profitability Report on Medical Malpractice contained in the National Association of Insurance Commissioners Report on Profitability By Line By State in 2008, which she asserts shows that California medical malpractice insurers are highly profitable. On July 9, 2010, we deferred ruling on the request pending consideration of the appeal's merits, which we now deny on the ground that the documents are not necessary or relevant to the resolution of this case.

to the availability of health care, the cap "no longer has a 'rational basis' *because there are no 'skyrocketing' malpractice insurance premiums to threaten health care*." (Original italics.)

Stinnett's claim fails because she is mistaken about the basis for the determination of the constitutionality of section 3333.2. In *American Bank*, the court explained that the Legislature has broad authority to modify the scope and nature of damages, and it is for the Legislature to make policy determinations as to the need for, and desirability of, an enactment, as long as the measure is rationally related to a legitimate state interest. (*American Bank, supra*, 36 Cal.3d at pp. 368–369; see also *Fein, supra*, 38 Cal.3d at pp. 157–158.) As the court explained in *Fein*, "the Legislature retains broad control over *the measure*, as well as *the timing*, of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and that the Legislature may expand or limit recoverable damages so long as its action is rationally related to a legitimate state interest." (*Fein, supra*, 38 Cal.3d at p. 158, original italics.) The court concluded the Legislature had a legitimate state interest in reducing medical malpractice insurance costs because the Legislature found a medical malpractice insurance crisis existed that required its intervention. (*American Bank, supra*, 36 Cal.3d at p. 372; see also *Fein, supra*, 38 Cal.3d at p. 158.) The court further concluded that the various provisions of MICRA it reviewed in *American Bank, Barme, Roa* and *Fein* all were rationally related to the legitimate state interest of reducing medical malpractice insurance costs. (*American Bank, supra*, 36 Cal.3d at p. 372; *Barme, supra*, 37 Cal.3d at p. 180; *Roa, supra*, 37 Cal.3d at p. 931; *Fein, supra*, 38 Cal.3d at p. 159.)

The court, however, specifically declined to determine whether such a medical malpractice insurance crisis actually existed. (*American Bank, supra*, 36 Cal.3d at pp. 371–372; see also *Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp.* (1994) 8 Cal.4th 100, 114 [32 Cal.Rptr.2d 263, 876 P.2d 1062] [explaining that through MICRA "[t]he Legislature has enacted a comprehensive, multifaceted scheme designed to address a *perceived threat* to our state's health care system by reducing the cost of medical malpractice insurance" (italics added)].) Instead, the court stated it was not the judiciary's function to reweigh the legislative facts underlying MICRA, and the Legislature, based on the information before it, rationally could conclude high malpractice insurance costs posed special problems with respect to the continued availability of adequate insurance coverage and medical care, and fashion remedies directed to the medical malpractice area to meet these problems. (*American Bank, supra*, 36 Cal.3d at p. 372.) Relying on this rationale, the court concluded in *Fein* that section 3333.2 also did not violate the equal protection clause. (*Fein, supra*, 38 Cal.3d at p. 161.)

Thus, the court did not find section 3333.2 constitutional based on a particular set of facts, i.e., whether a medical malpractice insurance crisis actually existed, but instead did so based on the Legislature's power to determine whether such a crisis existed and to craft remedies to solve the crisis the Legislature found. Put another way, in determining that section 3333.2 did not violate the equal protection clause, the court deferred to the Legislature, concluding it had made the requisite inquiry and decided, based on the facts before it, there was a need to regulate medical malpractice insurance and the scheme it enacted, MICRA, was rationally related to that need. Accordingly, the "changed circumstances" principle stated in *Brown* and *Chastleton* is not applicable here.

■    Essentially, Stinnett is contending the damages cap of section 3333.2 is no longer needed to reduce medical malpractice insurance costs. Our Supreme Court, however, rejected a similar argument in *American Bank*, namely that MICRA was unconstitutional because, since its enactment, it failed to reduce the overall costs of medical and hospital care. (*American Bank, supra*, 36 Cal.3d at p. 373.) As the court explained, "the constitutionality of a measure under the equal protection clause does not depend on a court's assessment of the empirical success or failure of the measure's provisions," and the equal protection clause is satisfied by the court's conclusion that, from the information before it, "the Legislature could rationally have decided that the enactment might serve its insurance cost reduction objective." (*American Bank, supra*, 36 Cal.3d at p. 374.)

■    Stinnett's contention appears more like an invitation for us to determine whether section 3333.2 has been rendered obsolete by subsequent events. While a change of conditions may justify the constitutional invalidation of a once valid law and can render the application of that law arbitrary and irrational, "the circumstances for such invalidation are quite narrow." (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 973 [81 Cal.Rptr.2d 93, 968 P.2d 993].) "Nothing in the United States Supreme Court's recent jurisprudence indicates that it envisions . . . an activist role for the courts," such as engaging "in the task of evaluating whether a piece of complex legislation has sufficiently measured up to its objectives to preserve its constitutional validity." (*Id.* at p. 973.) In our view, this is the type of evaluation Stinnett is asking us to engage in, i.e., whether the damages cap has fulfilled its purpose and is no longer required. Citing to the preamble of MICRA, Stinnett contends that in enacting MICRA the Legislature suggested its restrictions would remain valid only if the crisis that triggered its enactment existed for the "foreseeable future."[3] Even if that is the case, it is

---

[3] "The preamble to MICRA states: 'The Legislature finds and declares that there is a major health care crisis in the State of California attributable to skyrocketing malpractice premium costs and resulting in a potential breakdown of the health delivery system, severe hardships for

not the judiciary's function to determine when constitutionally valid legislation has served its purpose.

■ Stinnett contends it is a judicial responsibility to determine the constitutionality of a statute. We agree. Our Supreme Court, however, has already determined the constitutionality of section 3333.2 in *Fein*, in which it concluded the statute does not violate equal protection because the Legislature rationally could conclude a medical malpractice crisis existed that required legislative intervention to reduce medical malpractice insurance costs, and that section 3333.2 is rationally related to the cost reduction goal. ■ We are bound to follow the precedents of the California Supreme Court, which "are binding upon and must be followed by all the state courts of California." (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] (*Auto Equity*) ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction."].)

The cases Stinnett relies on do not compel a different result because they either did not involve complex legislative schemes like MICRA that were enacted as the result of legislative factfinding (see, e.g., *Brown, supra*, 8 Cal.3d at pp. 858–859 [concluding "automobile guest statute," that deprived an injured automobile guest of any recovery for the host's careless driving unless the injury results from the host's willful misconduct or intoxication, violated the constitutional guarantee of equal protection in part because it completely ignored the prevalence of liability insurance coverage, thereby undermining any rational connection between the prevention of suits and the protection of hospitality]; *Skalko v. City of Sunnyvale* (1939) 14 Cal.2d 213, 216 [93 P.2d 93] [finding changing conditions of neighborhood rendered the application of a zoning ordinance to a particular piece of property arbitrary and irrational]), or did not involve circumstances where the court was asked to constitutionally invalidate a law previously found to have passed constitutional muster (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 817–818, 820–821 [258 Cal.Rptr. 161, 771 P.2d 1247] [holding provision of Prop. 103 limiting rate adjustments prior to Nov. 1989 to insurers substantially threatened with insolvency invalid under the due process clause of the state and federal Constitutions since it could not be sustained as an emergency measure fashioned to meet a temporary exigency]; *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 314 [152

---

the medically indigent, a denial of access for the economically marginal, and depletion of physicians such as to substantially worsen the quality of health care available to citizens of this state. The Legislature, acting within the scope of its police powers, finds the statutory remedy herein provided is intended to provide an adequate and reasonable remedy within the limits of what the foregoing public health safety considerations permit now and into the foreseeable future.' (Stats. 1975, Second Ex. Sess. 1975–1976, ch. 2, § 12.5, p. 4007.)" (*American Bank, supra*, 36 Cal.3d at p. 372, fn. 11.)

Cal.Rptr. 903, 591 P.2d 1] [concluding statute Legislature enacted in reaction to Prop. 13 invalidating agreements granting cost-of-living wage increases to local public agency employees invalid as an impairment of contract, in violation of both the state and federal Constitutions]).[4]

█ Stinnett's contention that section 3333.2 deprives her of equal protection of the laws because her $250,000 in noneconomic damages does not have the same purchasing power that $250,000 in noneconomic damages had in 1975 also fails. *Fein* has already decided this statute is "rationally related to a legitimate state interest" and "rationally related to the legislative purpose." (*Fein, supra,* 38 Cal.3d at pp. 160 & 162, fn. omitted.) Therefore there is no equal protection violation. (*City of New Orleans, supra,* 427 U.S. at pp. 303–304.) Moreover, we note that section 3333.2 does not violate equal protection on this basis for yet another reason—it draws no distinction at all between Stinnett and a 1975 plaintiff, as both are limited in their recovery of noneconomic damages to the same amount. The statute does not address purchasing power; instead, it addresses the maximum dollar amount of noneconomic damages a plaintiff may recover in an action against a health care provider based on professional negligence, which is the same amount for every such plaintiff. The fact that Stinnett might prefer a different statute, indexed for inflation, does not render unconstitutional the statute the Legislature enacted. " 'We are not equipped to decide desirability; and a court cannot eliminate measures which do not happen to suit its tastes if its seeks to maintain a democratic system. The forum for correction of ill-considered legislation is a responsive legislature.' " (*Werner v. Southern Cal. etc. Newspapers, supra,* 35 Cal.2d 121, 130 (*Werner*), quoting *Daniel v. Family Ins. Co.* (1949) 336 U.S. 220, 224 [93 L.Ed. 632, 69 S.Ct. 550].)

█ Article I, section 7, subdivision (a) of the California Constitution states, in pertinent part: "A person may not be . . . denied equal protection of the laws." Like its federal counterpart, the state equal protection clause requires that a classification " 'bear some rational relationship to a conceivable legitimate state purpose.' " (*Cooper, supra,* 21 Cal.3d at pp. 847–848; in

---

[4] Stinnett asserts that courts in other states have accepted her analysis that if no medical malpractice insurance crisis exists, legislation enacted to address the crisis must be struck down as unconstitutional. While Stinnett recognizes these cases are not controlling here, she argues they are "illustrative of the result that flows from the 'serious and genuine judicial inquiry' required by *Fein.*" But the California Supreme Court implicitly rejected the reasoning in two of the cases Stinnett cites, *Arenson v. Olson* (N.D. 1978) 270 N.W.2d 125 and *Boucher v. Sayeed* (R.I. 1983) 459 A.2d 87, when it noted their existence in *American Bank* and that the courts in those cases had reached a conclusion contrary to the courts of 23 states and three federal circuits which had rejected equal protection challenges in the medical malpractice insurance setting. (*American Bank, supra,* 36 Cal.3d at p. 370, fn. 10.) We need not consider the other two cases, *Aldana v. Holub* (Fla. 1980) 381 So.2d 231 and *Ferdon v. Wisconsin Patients Compensation Fund* (2005) 284 Wis.2d 573 [701 N.W.2d 440], as we are bound by decisions of the California Supreme Court.

accord, *Warden v. State Bar* (1999) 21 Cal.4th 628, 644–645 [88 Cal.Rptr.2d 283, 982 P.2d 154].) *Fein* held that such a rational relationship exists. (*Fein, supra*, 38 Cal.3d at pp. 162–163.) ▮ Stinnett's contention that section 3333.2 violates the state equal protection clause is therefore likewise without merit.[5]

### Jury Trial

▮ Article I, section 16 of the California Constitution states in pertinent part: "Trial by jury is an inviolate right and shall be secured to all, but in a civil cause three-fourths of the jury may render a verdict." (Cal. Const., art. I, § 16.) Notwithstanding our Supreme Court's pronouncements that "[i]t is well established that a plaintiff has no vested property right in a particular measure of damages, and . . . the Legislature possesses broad authority to modify the scope and nature of such damages" (*American Bank, supra*, 36 Cal.3d at p. 368), and "the Legislature retains broad control over *the measure*, as well as *the timing*, of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and . . . the Legislature may expand or limit recoverable damages so long as its action is rationally related to a legitimate state interest" (*Fein, supra*, 38 Cal.3d at p. 158), Stinnett contends the Legislature does not have this authority—only a jury does.

This argument was rejected more than 20 years ago in *Yates v. Pollock* (1987) 194 Cal.App.3d 195 [239 Cal.Rptr. 383], and we reject it again here for the same reason—*Fein* and *American Bank* instruct us otherwise and we are bound to follow the precedents of the California Supreme Court. (*Auto Equity, supra*, 57 Cal.2d at p. 455.) We also observe that *Fein* and *American Bank* are not by any means the only California Supreme Court cases holding that the Legislature possesses broad authority to modify the scope and nature of recoverable damages. In *Werner, supra*, 35 Cal.2d at page 128, the court stated: "[W]e cannot say that the Legislature could not reasonably conclude that the danger of excessive recoveries of general damages in libel actions justified limitation of recovery to special damages when a retraction has not been demanded and refused." (See also *Feckenscher v. Gamble* (1938) 12 Cal.2d 482, 499 [85 P.2d 885] [noting that "the measure of damages was changed by the [L]egislature by an amendment" and "no one has a vested right in a measure of damages"].)

---

[5] While we acknowledge our dissenting colleague's position, we note that Stinnett did not request a further hearing below, did not ask the trial court to receive live testimony or additional evidence, and did not ask for factual findings.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents. Appellant's June 21, 2010 request for judicial notice is denied.

Cornell, Acting P. J., concurred.

**DAWSON, J.,** Concurring and Dissenting.—I agree with the majority's view regarding appellant Holly Stinnett's contention that the noneconomic damages cap of Civil Code section 3333.2[1] violates her right to a jury trial under the California Constitution. We are bound to reject the argument by the California Supreme Court's opinions in *American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 376–377 [204 Cal.Rptr. 671, 683 P.2d 670], and *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 159–160 [211 Cal.Rptr. 368, 695 P.2d 665].

I dissent, however, from the majority's rejection of appellant's equal protection arguments, which she makes under both the federal and California Constitutions. I do so because appellant has in effect been denied the opportunity to "introduce evidence supporting [her] claim that[, under circumstances existing today, section 3333.2] is irrational . . . ." (*Minnesota v. Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 464 [66 L.Ed.2d 659, 101 S.Ct. 715] (*Minnesota*), citing *U.S. v. Carolene Products Co.* (1938) 304 U.S. 144, 153–154 [82 L.Ed. 1234, 58 S.Ct. 778].) The trial court appears to have ruled as a matter of law against appellant's equal protection challenge to the statute. The court labeled the challenge "a legislative matter." And although respondents Tony Tam and Modesto Surgical Associates registered several objections to appellant's evidence, the court failed to rule on any of those objections. It appears the court ruled without considering appellant's evidence.

Appellant, of course, "cannot prevail [on her equal protection claim] so long as 'it is evident from all the considerations presented . . . that the question [of a logical connection between section 3333.2 and the objective of MICRA[2]] is at least debatable.' " (*Minnesota, supra,* 449 U.S. at p. 464; see also *In re Furnace* (2010) 185 Cal.App.4th 649, 664 [110 Cal.Rptr.3d 820] [rational relationship established by showing of "logical connection"].) "The State is not compelled to verify logical assumptions with statistical evidence." (*Hughes v. Alexandria Scrap Corp.* (1976) 426 U.S. 794, 812 [49 L.Ed.2d 220,

---

[1] Further statutory references are to the Civil Code unless indicated.

[2] MICRA is the acronym for the Medical Injury Compensation Reform Act of 1975. (See Stats. 1975, 2d Ex. Sess. 1975–1976, ch. 1, § 26.6, pp. 3975–3976.)

96 S.Ct. 2488].) This presumption in favor of the statute may well prove to be an insurmountable obstacle to appellant's attack on section 3333.2. But she is nonetheless entitled to make that attack and to support it with the introduction of evidence. (*Minnesota, supra*, at p. 464.)

This is not to suggest that the trial court should or even may engage in an examination of legislative purpose or of the success or failure of section 3333.2 in attaining it. (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 973 [81 Cal.Rptr.2d 93, 968 P.2d 993].) Absent a showing that a standard of review more stringent than the rational relationship test applies, the trial court would be required to determine whether—and only whether—under current circumstances, section 3333.2 is irrational. Appellant would bear "the burden of demonstrating" such irrationality. (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 480 [97 Cal.Rptr.2d 334, 2 P.3d 581].)[3]

Respondents seek to convince this court that there is a rational relationship between section 3333.2 and MICRA's legislative purpose. They do so in part by offering factual allegations—for example, that "family physicians in both rural and urban areas have either decreased or limited services to lower the cost of their malpractice insurance," and "there is data supporting the conclusion that, after 1975, MICRA's noneconomic damage cap continued to impede spiraling malpractice insurance premium charges." In support, they cite various studies and reports. But they submitted no evidence to the trial court, and these studies and reports are not properly before us. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379 [112 Cal.Rptr.3d 853, 235 P.3d 152].) We are not a factfinding court; we are a Court of Appeal, bound to review factual determinations made by trial courts, not to take evidence or decide questions of fact in the first instance. (1 Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 2010) ¶ 8:1 et seq. (rev. # 1, 2010).) Respondents have given us no basis upon which to vary from our normal role here.

The majority, I note, refrains from stating any conclusion about whether the damages cap of section 3333.2, under current circumstances, does or does not remain rationally related to legislative purpose. I join in that restraint.[4]

---

[3] Amici curiae AARP and others assert that the damages cap of section 3333.2 has a disparate impact on the elderly, the poor, the disabled, and homemakers. Appellant, however, has presented no such evidence and has not asserted that any test more stringent than the rational relationship test applies.

I also, however, join in the majority's rejection of the argument that section 3333.2 violates equal protection because the damages cap is not indexed for inflation. The absence of indexing does not create a distinction for purposes of either federal or state equal protection analysis.

What we have before us is a one-sided factual presentation, with no ruling on evidentiary objections and no evaluation by the trial court after informed critical analysis. This is not a record upon which this court should base a ruling resolving a constitutional attack on legislative action.

For these reasons, I would remand this case to the trial court for a new hearing on the continuing validity of section 3333.2.

A petition for a rehearing was denied September 21, 2011, and appellant's petition for review by the Supreme Court was denied November 30, 2011, S197135. Werdegar, J., and Liu, J., were of the opinion that the petition should be granted.