Filed 6/9/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JESSICA CHAN et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> PETER CURRAN, <br><br>     Defendant and Respondent. | A138234 <br><br> (San Francisco City & County <br> Super. Ct. No. CGC-10-502053) |

## I. INTRODUCTION

After plaintiff and appellant Jessica Chan's mother died from internal hemorrhaging related to Coumadin use following heart surgery, Chan successfully sued defendant and respondent Peter Curran for medical malpractice. Neither the sufficiency of the evidence to support the malpractice verdict, nor any other issue associated with the trial and the rendition of the jury verdict, is before us. Rather, the sole issue on appeal is the trial court's postverdict reduction of the $1 million noneconomic damages award to $250,000, as required by the Medical Injury Compensation Reform Act of 1975 (MICRA; Stats. 1975, 2d Ex. Sess. 1975–1976, ch. 1, § 26.6, pp. 3949–4007; Civ. Code, § 3333.2.)[1] Chan attacks the MICRA cap on multiple constitutional grounds—as violating equal protection, due process and the right to jury trial. All of her arguments, however, are ultimately grounded on the assertion she is entitled to seek noneconomic damages sufficient to cover attorney fees. No California court has ever endorsed such a proposition, and, as we discuss, it is contrary to many well-established legal principles.

---

[1] All further references are to the Civil Code unless otherwise indicated.

Since MICRA's enactment in 1975, the cap on noneconomic damages has been before the California Supreme Court many times.  In 1985, the high court upheld the cap against equal protection and due process challenges.  (*Fein v. Permanente* (1985) 38 Cal.3d 137 [211 Cal.Rptr. 368, 695 P.2d 665] (*Fein*).)  In 1994, the court ruled the cap also applies to actions for partial indemnity, voicing no criticism of the statute and reiterating MICRA "reflects a strong public policy to contain the costs of medical malpractice insurance by controlling or redistributing liability for damages, thereby maximizing the availability of medical services to meet the state's health care needs." (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 112 [32 Cal.Rptr.2d 263, 876 P.2d 1062] (*Western Steamship*).)  In 1998, the court explained how the damages cap interacts with MICRA's provision for periodic payments, stating the cap is "an attempt to control and reduce medical malpractice insurance costs by placing a predictable, uniform limit on the defendant's liability for noneconomic damages."  (*Salgado v. County of Los Angeles* (1998) 19 Cal.4th 629, 641 [80 Cal.Rptr.2d 46, 967 P.2d 585] (*Salgado*).)  The following year, in 1999, the court held the cap applies to negligence-based claims under the federal Emergency Medical Treatment and Active Labor Act (42 U.S.C. § 1395dd), discerning Congress incorporated state damages law to preserve damages limitations and to respond to concerns raised about the federal statute's impact on the medical malpractice insurance problem.  (*Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 112 [83 Cal.Ptr.2d 145, 972 P.2d 966] (*Barris*).)  Most recently, in 2014, the court ruled the cap cannot be further diminished by setoffs for settlements attributable to noneconomic damages.  The Legislature's focus in enacting the statute, the court stated, was "to address the problem of unpredictable jury awards," the impact on settlements being only indirect.  (*Rashidi v. Moser* (2014) 60 Cal.4th 718, 720–721 [181 Cal.Rptr.3d 59, 339 P.3d 344] (*Rashidi*).)  Although asked to do so, the court declined to grant review in *Rashidi* on the continuing constitutional validity of the damages cap.

Chan nevertheless maintains *Fein*, which rejected equal protection and due process challenges, is no longer controlling, claiming she has shown there no longer is a medical malpractice insurance "crisis" and therefore the rationale for the cap (indeed, for all of MICRA) no longer exists. Thus, according to Chan, the time is ripe to re-examine the constitutionality of section 3333.2 under a "changed circumstances" analysis. She further contends the Supreme Court has never considered her claim the cap infringes on the right to jury trial.

As we explain, the courts are extremely chary of invalidating legislative acts that have previously been held constitutional. Our Supreme Court has done so only on rare occasion, and we conclude Chan has not shown there is no reasonably plausible purpose presently advanced by section 3333.2. The high court has also considered and rejected variations of Chan's right to jury trial argument, and, in any case, statutes defining the measure or limit of legally recoverable damages do not constitutionally interfere with the fundamental fact-finding province of a jury. We therefore conclude the legitimate debate over the wisdom of MICRA's noneconomic damages cap remains a matter for the Legislature and state electorate.[2]

## II. DISCUSSION

### A. *MICRA*

"In May 1975, the Governor—citing serious problems that had arisen throughout the state as a result of a rapid increase in medical malpractice insurance premiums—convened the Legislature in extraordinary session to consider measures aimed at remedying the situation. In response, the Legislature enacted the Medical Injury Compensation Reform Act of 1975 (MICRA) . . . , a lengthy statute which attacked the

---

[2] In the November 4, 2014, general election, California voters defeated Proposition 46, which, in part, would have modified MICRA's noneconomic damages limitation to reflect inflation, raising the cap to approximately $1.1 million as of January 1, 2015, and calling for annual adjustments thereafter. (See Ballot Pamp., Gen. Elec. (Nov. 4, 2014) analysis of Prop. 46, p. 28; *id.*, text of Prop. 46, p. 69.)

problem on several fronts." (*American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 363 [204 Cal.Rptr. 671, 683 P.2d 670] (*American Bank*).) "In broad outline, the act (1) attempted to reduce the incidence and severity of medical malpractice injuries by strengthening governmental oversight of education, licensing and discipline of physicians and health care providers,[3] (2) sought to curtail unwarranted insurance premium increases by authorizing alternative insurance coverage programs and by establishing new procedures to review substantial rate increases,[4] and (3) attempted to reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation." (*Id.* at pp. 363–364.)

In the Legislature's view, "[t]he continuing availability of adequate medical care depends directly on the availability of adequate insurance coverage, which in turn operates as a function of costs associated with medical malpractice litigation." (*Western Steamship, supra,* 8 Cal.4th at p. 111.) "Accordingly, MICRA includes a variety of provisions all of which are calculated to reduce the cost of insurance by limiting the amount and timing of recovery in cases of professional negligence. (See Bus. & Prof. Code, § 6146 [limiting contingency fees in medical malpractice actions]; Civ. Code, § 3333.1 [admitting evidence of collateral source payments and precluding subrogation on behalf of collateral sources]; Code Civ. Proc., § 667.7 [authorizing periodic payments for future damages in excess of $50,000, with termination of benefits in the event of death] . . . . .)" (*Western Steamship,* at p. 112.)

The cap on noneconomic damages set forth in section 3333.2 is one of these inter-related provisions.[5] "The Legislature has enacted a comprehensive, multifaceted scheme

---

[3] E.g. Business and Professions Code sections 800 et seq.; California Code of Regulations section 25009.9 (former § 2100.6); 2190 (former § 2101.3).

[4] See Insurance Code sections 11587–11588.

[5] Section 3333.2 provides in pertinent part: "(a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience,

4

designed to address a perceived threat to our state's health care system by reducing the cost of medical malpractice insurance.  Section 3333.2 constitutes a key component of this program." (*Western Steamship, supra*, 8 Cal.4th at p. 114.)

During the 1980's, the Supreme Court upheld many of MICRA's provisions against constitutional challenges, including section 3333.2.  (*Fein*, *supra*, 38 Cal.3d at p. 159 [upholding § 3333.2]; *Roa v. Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920, 931–932 [211 Cal.Rptr. 77, 695 P.2d 164] (*Roa*) [upholding Bus. & Prof. Code, § 6146, limiting contingency fees]; *Barme v. Wood* (1984) 37 Cal.3d 174 [207 Cal.Rptr. 816, 689 P.2d 446] (*Barme*) [upholding § 3333.1, limiting collateral source recovery from malpractice defendants]; *American Bank*, *supra*, 36 Cal.3d at p. 372 [upholding Code Civ. Proc., § 667.7, governing periodic payouts of and imposing some limits on future damages].)  As noted at the outset, the court has also subsequently addressed the noneconomic damages cap numerous times, without criticism of the statute and reiterating MICRA's public policy underpinnings.  (*Rashidi, supra,* 60 Cal.4th at 726–727; *Barris, supra,* 20 Cal.4th at pp. 108–116; *Salgado, supra,* 19 Cal.4th at pp. 638–645; *Western Steamship, supra,* 8 Cal.4th at p. 112.)

As to section 3333.2, specifically, the Supreme Court has observed, " '[o]ne of the problems identified in the legislative hearings was the unpredictability of the size of large noneconomic damage awards, resulting from the inherent difficulties in valuing such damages and the great disparity in the price tag which different juries placed on such losses.  The Legislature could reasonably have determined that an across-the-board limit would provide a more stable base on which to calculate insurance rates.' " (*Western Steamship, supra,* 8 Cal.4th at p. 112, quoting *Fein, supra,* 38 Cal.3d at p. 163.)  The court further noted, "[s]ubjecting health care providers to unlimited liability for

_____

physical impairment, disfigurement and other nonpecuniary damage.  [¶] (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)."

5

noneconomic damages in third party suits can only thwart the goal of containing insurance costs by eliminating the statutory constraint on litigation expenses." (*Western Steamship*, at p. 114; see also *Salgado, supra,* 19 Cal.4th at p. 641 [cap is "an attempt to control and reduce medical malpractice insurance costs by placing a predictable, uniform limit on the defendant's liability for noneconomic damages"].)

**B.  *Showing With Respect to "Changed Circumstances"***

**1.  *Chan's Showing***

Chan acknowledges the cases discussed above, but contends the medical malpractice climate is profoundly different today than it was in 1975 when MICRA was enacted and in the 1980's when the Supreme Court passed on the constitutionality of its provisions.

In the trial court, Chan offered evidence that, since 1975, inflation has caused a roughly four-fold devaluation of the dollar.  Thus, adjusted for inflation, the $250,000 noneconomic damages cap enacted in 1975 was worth $1.06 million in 2012 dollars.  Or, flipped around, $250,000 in 2012 dollars equaled only $59,000 in 1975 dollars.  Chan also offered the declaration of Phillip Allman, an economist, who observed there has been an approximately six-fold increase in the cost of legal services since 1976 and opined the $250,000 noneconomic damages cap discourages contingent-fee lawyers from taking many malpractice cases.  Government statistics proffered by Chan also showed a precipitous increase in the cost of medical services and medical experts' hourly fees.

Chan additionally offered declarations from current California attorneys who take personal injury cases on a contingency basis.  However, because of MICRA, they either refuse to consider medical malpractice cases altogether, or take only those cases that appear strong and involve large economic damages, so the total amount of recoverable damages is likely to exceed $1 million.  These attorneys declared they turn away from 50 to over 90 percent of facially meritorious malpractice claims.  Thus, according to these attorneys, cases involving severe injury or death to the elderly and unemployed often do

not reach the courts because economic damages are likely to be small, since lost wages are usually nonexistent and, if the victim is deceased, there are no future medical costs.

These attorneys also discussed their view that there are serious imbalances in the resources plaintiffs and defendants are able to bring to bear in contingency fee cases, claiming insurance-industry lawyers can far outspend and out-staff cases because their clients pay by the hour and MICRA does not limit the amount of collectable fees. As did Chan's economist, these attorneys pointed out the high cost of investigating and proving medical malpractice given the ever rising costs of litigation, including the cost of expert witnesses. Some also noted the additional risk that doctors, aware of the noneconomic damages cap, will invoke another provision of MICRA allowing them to unilaterally reject settlement offers an insurer might otherwise accept, further driving up litigation costs.

Chan also pointed to empirical studies of lawyers across the country, recounted in legal periodicals, confirming the anecdotal evidence provided by the attorney declarations—that damages caps appear to reduce contingency fee lawyers' interest in taking medical malpractice cases with limited noneconomic damages and encourage them to focus on cases with high economic damages. Across all states, most attorneys rejected more than 90 percent of the medical malpractice cases brought to them. About 39 percent of time this was because the damages expected from a victory were viewed as insufficient to make the case worth the attorney's time. On the whole, if a lawyer perceived a 95 percent chance of success, the lawyer would want a case worth $250,000; a 51 percent chance of success, a case worth $500,000; and a 25 percent chance of success, a case worth $1 million.

As for this case, specifically, Chan's attorney submitted declarations outlining how the costs incurred (approximately $103,000) and legal fees (approximately $450,000, if based on hourly rates between $250 and $650 an hour) far exceeded the total jury award after the adjustment under MICRA ($321,562 net award), let alone the

7

maximum allowable contingency fee thereon.[6]

Finally, Chan asserted Proposition 103, passed by the voters in 1988, has so completely solved the problem of high medical malpractice insurance rates there is no further need for MICRA's noneconomic damages cap. Proposition 103 prohibits the Insurance Commissioner from approving rates that are excessive, inadequate, or unfairly discriminatory, and from allowing such rates to remain in effect. (Ins. Code, § 1861.05.) Chan submitted the declaration of an actuary stating that between MICRA's enactment in 1975, and Proposition 103's enactment in 1988, medical malpractice insurance premiums rose an average of 14 percent per year, but since 1988, premiums have increased an average of only 1 percent per year. During both periods, there were years in which premiums spiked by more than 10 percent, but that occurred far more often in the 1975–1988 period. The actuary further opined California medical malpractice insurers are enjoying a period of high profits, both in the abstract and in comparison to their counterparts nationwide.

### 2. *Curran's Showing*

Curran did not submit evidence rebutting Chan's claims of inflation and rising litigation costs. Instead, he submitted a declaration from James Hurley, an actuary, who discussed the past and continuing efficacy of MICRA in holding the line on medical malpractice insurance costs. He opined the noneconomic damages cap has succeeded in having, from 1975 on, an ongoing downward influence on the cost of medical malpractice insurance and that without the cap, "it would be reasonable to expect increases" in rates. According to Hurley, eliminating the cap could destabilize the insurance market because of "likely increases in claim costs and potential reduced willing

---

[6] MICRA also limits contingency fees in medical malpractice cases on a sliding scale basis, allowing 40 percent on the first $50,000 recovered, 331/3 percent on the next $50,000, 25 percent on the next $500,000, and 15 percent on any recover exceeding $600,000. (Bus. & Prof. Code, § 6146, subd. (a).)

8

underwriting capacity." In support of this opinion, Hurley cited figures showing various annual rate changes in the 2000's were lower in California than in other states. He also noted figures associated with others states' MICRA-like laws and with Texas's change-over to a cap. Hurley further opined California insurers are not, despite MICRA, profiting more than their nationwide counterparts (once a unique situation in New York is removed from the calculus), nor are they keeping reserves or surpluses out of line with those counterparts.

Curran also submitted a declaration from his attorney asserting Curran, contrary to Chan's accusations concerning an imbalance in resources, used fewer and less expensive resources than Chan in litigating the case. A declaration from Curran's insurer confirmed the $200 partner rate paid to Curran's attorney was typical of such cases.

## C. *Equal Protection*

"Where, as here, a disputed statutory disparity implicates no suspect class or fundamental right, 'equal protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." ' " (*Johnson v. Dept. of Justice* (2015) 60 Cal.4th 871, 881 [183 Cal.Rptr.3d 96, 341 P.3d 1075] (*Johnson*), quoting *People v. Turnage* (2012) 55 Cal.4th 62, 74 [144 Cal.Rptr.3d 489, 281 P.3d 464] (*Turnage*).)

Chan does not dispute that the rational relationship test applies to her equal protection challenge to MICRA's noneconomic damages cap. (See *Fein*, *supra*, 38 Cal.3d at pp. 158, 162 [rational relationship test applicable to equal protection challenge to section 3333.2].) She points out, however, the Supreme Court observed in *Fein* a reviewing court must " ' "conduct '*a serious and genuine judicial inquiry* into the correspondence between the [challenged] classification and the legislative goals.' " ' " (*Fein*, at p. 163.)

This has " 'never been interpreted to mean,' " however, that the courts " 'may properly strike down a statute simply because [they] disagree with the wisdom of the law

9

or because [they] believe that there is a fairer method for dealing with the problem.' [Citation.]  The court in *Fein* explained that in that case, as well as in the court's earlier MICRA decisions, [it] had conducted the 'serious and genuine judicial inquiry' . . . by (1) finding that 'the statutory classifications are rationally related to the "realistically conceivable legislative purpose[s]" . . . of MICRA,' and (2) by declining to 'invent[] fictitious purposes that could not have been within the contemplation of the Legislature . . . .' "  (*Warden v. State Bar* (1999) 21 Cal.4th 628, 648 [88 Cal.Rptr.2d 283, 982 P.2d 154] (*Warden*) [rejecting argument court had made rational relationship standard more stringent].)

The " 'basic and conventional standard for reviewing economic and social welfare legislation' " that draws nonsuspect classifications and does not impinge on fundamental rights " 'invests legislation involving such differentiated treatment with a presumption of constitutionality and "requir[es] merely that distinctions drawn . . . bear some rational relationship to a conceivable legitimate state purpose."  [Citation.]' "  (*Warden, supra*, 21 Cal.4th at p. 641, quoting *D'Amico v. Bd. Of Medical Examiners* (1974) 11 Cal.3d 1, 16–17 [112 Cal.Rptr. 786, 520 P.2d 10], disapproved on other grounds in *Woodland Hills Residents Assn., Inc. v. City Council of Los Angeles* (1979) 23 Cal.3d 917, 944 [154 Cal.Rptr. 503, 593 P.2d 200].)  Thus, under the rational relationship test, " '[w]here there are "plausible reasons" for [the classification] "our inquiry is at an end." ' " (*Warden*, *supra*, at p. 644; accord, *Johnson, supra,* 60 Cal.4th at p. 881.)

" 'This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve.  Nor must the underlying rationale be empirically substantiated.  [(*Heller* [*v. Doe* (1993) 509 U.S. 312, 320] [113 S.Ct. 2637, 125 L.Ed.2d 257].]  While the realities of the subject matter cannot be completely ignored (*id*. at p. 321), a court may engage in " 'rational speculation' "  as to the justifications for the legislative choice (*id*. at p. 320).  It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record." '

10

(*Turnage*, at pp. 74–75.)' " (*Johnson, supra,* 60 Cal.4th at p. 881; accord, *Warden, supra,* 21 Cal.4th at p. 650 [" 'a legislative choice is not subject to courtroom factfinding and may be based on rational speculation *unsupported by evidence or empirical data*' "].) "[W]hen there is a reasonably conceivable justification for a classification, '[i]t is . . . "constitutionally irrelevant whether [the] reasoning in fact underlay the legislative decision" ' [citations], or whether the 'conceived reason for the challenged distinction actually motivated the legislature.' " (*Warden, supra,* 21 Cal.4th at p. 650.)

"While parties challenging legislation under the equal protection clause may introduce evidence supporting their claim that the legislation is irrational, they cannot prevail if it is evident that ' "the question is at least debatable." ' " (*Stinett v. Tam* (2011) 198 Cal.App.4th 1412, 1427 [130 Cal.Rptr.3d 732] (*Stinett*), quoting *Minnesota v. Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 464 [101 S.Ct. 715, 66 L.Ed.2d 659].) Thus, "[t]o mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed statutory disparity. (*Heller*, [*supra*, 509 U.S.] at p. 320; see *Turnage*, [*supra*, 55 Cal.4th] at p. 75.) If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' (*Heller*, at p. 319; see *Turnage*, at p. 74.)" (*Johnson, supra,* 60 Cal.4th at p. 881.)

As we have discussed, during the 1980's, the Supreme Court upheld numerous provisions of MICRA against equal protection challenges, including the noneconomic damages cap. (*Fein, supra*, 38 Cal.3d 137 [upholding § 3333.2]; *Roa, supra*, 37 Cal.3d 920 [upholding Bus. & Prof. Code, § 6146, capping the recovery of contingency fees in medical malpractice cases]; *Barme, supra*, 37 Cal.3d 174 [upholding § 3333.1, limiting collateral source recovery from malpractice defendants]; *American Bank, supra*, 36 Cal.3d at p. 359 [upholding Code Civ. Proc., § 667.7, governing payout of, and limiting some, future damages].)

The court readily concluded the damages cap was rationally related to the Legislature's declared purpose of "responding to an insurance 'crisis.' " (*Fein, supra,*

11

38 Cal.3d at p. 162.) "It appears obvious that this section—by placing a ceiling of $250,000 on the recovery of noneconomic damages—is rationally related to the objective of reducing the costs of malpractice defendants and their insurers." (*Id.* at p. 159.)

Given that the Supreme Court has already rejected an equal protection challenge to MICRA's noneconomic damages cap, Chan relies on a "changed circumstances" argument claiming (a) there no longer is a medical malpractice insurance crisis, (b) Proposition 103, under which the California Insurance Commissioner now sets medical malpractice insurance rates, has stabilized the insurance market, and (c) the ravages of inflation have decimated the economic significance of $250,000 in recoverable noneconomic damages. Chan thus asserts MICRA's non-economic damages cap is no longer rationally defensible.

The role of "changed circumstances" in constitutional analysis is fraught with institutional tension and analytical difficulties. "It is not . . . easy for courts to step in and say that what was rational in the past has been made irrational by the passage of time, change of circumstances, or the availability of new knowledge. Nor should it be. Too many issues of line drawing make such judicial decisions hazardous. Precisely at what point does a court say that what once made sense no longer has any rational basis? What degree of legislative action, or of conscious inaction, is needed when that (uncertain) point is reached? These difficulties—and many others—counsel restraint, and do so powerfully." (*United States v. Then* (2d Cir. 1995) 56 F.3d 464, 468 (con. opn. of Calabresi, J.); see generally *Changed Circumstances and Judicial Review* (2014) 89 N.Y.U. L. Rev. 1419.)

The maxims that govern rational basis review further contribute to the difficulties of a "changed circumstances" analysis, including that classifications may be based on " 'rational speculation unsupported by evidence or empirical data' " and are permissible if rationally related to any " 'realistically conceivable legislative purpose' " and regardless of whether the " 'conceived reason . . . actually motivated the legislature.' "

12

(*Warden*, *supra*, 21 Cal.4th at pp. 649–651, italics omitted.)  Moreover, courts may engage in " 'rational speculation' "  as to the justification for a legislative choice, and it is immaterial " ' "whether or not" any such speculation has "a foundation in the record." ' (*Turnage*, [*supra*, 55 Cal.4th] at pp. 74–75.)"  (*Johnson, supra,* 60 Cal.4th at p. 881; cf. *Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 973 & fn. 4 [81 Cal.Rptr.2d 93, 968 P.2d 993] (*Santa Monica Beach*) [noting in discussing "changed circumstances" that court has more closely examined legislative factfinding where fundamental rights are at stake].)

Thus, "[g]enerally, modification or repeal of a statute made obsolete by virtue of changed conditions is a legislative, not a judicial, prerogative."  (*Stinnett, supra,* 198 Cal.App.4th at p. 1428.)

Nevertheless, the courts have, on rare occasion, concluded "changed circumstances can transform a once-rational statute into an irrational one" and invalidated "antiquated statutes" on equal protection grounds.  (*Burlington Northern Railroad Co. v. Department of Public Service Regulation* (9th Cir. 1985) 763 F.2d 1106, 1111 & fn. 3 [further noting "[w]here courts have invalidated archaic statutes, there is often an independent constitutional basis for so doing (i.e., a belated recognition that the statutes were unconstitutional as written")]; see also *Santa Monica Beach, supra,* 19 Cal.4th at p. 973 [the "circumstances for such invalidation are quite narrow"].)

Chan relies on *Brown v. Merlo* (1973) 8 Cal.3d 855 (*Brown*) [106 Cal.Rptr. 388, 506 P.2d 212], in which the Supreme Court employed a changed circumstances analysis to invalidate portions of California's venerable "guest statute," which had been enacted in 1926 and barred nonpaying passengers from suing negligent "host" drivers.  The statute also had a "series of limiting statutory 'loopholes,' " that created an "absurd and illogical pattern which completely drain[ed] the statute of any rationality it might conceivably claim."  (*Id.* at p. 860.)  The court articulated the applicable analytical framework as follows:  "[A] classification which once was rational because of a given set of

13

circumstances may lose its rationality if the relevant factual premise *is totally altered*." (*Id.* at p. 869, italics added.)

The court identified the two justifications "traditionally . . . advanced" to support the guest statute's classification scheme as (1) the promotion of "hospitality by insulating generous drivers from lawsuits instigated by ungrateful guests" and (2) the elimination of "collusive suits, in which a host fraudulently confesses negligence so as to permit his guest . . . to collect from the host's insurance." (*Brown, supra*, 8 Cal.3d at p. 864.) It then concluded two pivotal developments wholly undermined the first justification—the expansion of the duty of due care in *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561],[7] and the widespread prevalence of automobile liability insurance. (*Brown*, at pp. 865–867 & fn. 6 [in 1929, California tort law imposed duty of due care only on business "invitees" and a lesser standard of care to "licensees," including social guests], 868–872 & fn. 9 [in "late 1920's automobile liability insurance was the exception rather than the rule"].) In short, it was now "irrational to assume that if a recipient of generosity is permitted recovery for negligent injuries, the cause of 'ingratitude' will be served or the cause of 'hospitality' will be plundered." (*Id.* at p. 872.) The court similarly dispensed with the collusive justification—recent cases invalidating "the entire range of intrafamilial immunities, establish[ed] that it is unreasonable to eliminate causes of action of an entire class of persons simply because some undefined portion of the designated class may file fraudulent lawsuits." (*Id.* at p. 875.) The constitutional vice with the guest statute as to this justification, said the court, was that it was "so grossly over inclusive [prohibiting *all* guests from bringing *any* negligence claims against a driver] as to defy notions of fairness or reasonableness." (*Id.*

---

[7] Partially superseded by statute on a different issue as stated in *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 722 [80 Cal.Rptr.2d 506, 968 P.2d 65], disapproved on a different issue in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493].

14

at p. 877.)

In sum, *Brown* concluded that given sea changes in the common law of torts and the availability of automobile liability insurance, along with the statutory exceptions further undermining any conceivable rationality for the statute, there was no remaining rational underpinning for the challenged provisions of California's archaic guest statute. The court also observed, at the end of its opinion, that "[f]rom their very inception, automobile guest statutes have been the subject of severe criticism, both academic and judicial. In our view, the widespread antipathy to such statutes is in large part a reflection of the irrationality and unfairness of these legislative schemes, which strip the single class of automobile guests of any protection from negligently inflicted injuries." (*Brown, supra*, 8 Cal.3d at pp. 882–883, fn. omitted.) Subsequently, in *Cooper v. Bray* (1978) 21 Cal.3d 841 [148 Cal.Rptr. 148, 582 P.2d 604] (*Cooper*), the court invalidated another provision of the guest statute, barring owner-passengers from suing permissive drivers, for reasons similar to those it identified in *Brown*.

In *In re Paris Air Crash* (9th Cir. 1980) 622 F.2d 1315, the Ninth Circuit, in rejecting an equal protection challenge to California's bar against punitive damages in wrongful death cases (in contrast to their availability in survival actions), distinguished *Brown* and *Cooper* as dealing with long repudiated guest statues. The guest statutes, said the circuit court, were "more burdensome and anomalous than other limitations on recovery for four reasons." (*In re Paris Air Crash, supra,* at p. 1321.) First, the guest statutes had "denied a large class of persons any compensation at all for grievous physical injury." (*Ibid.*) Second, the guest statutes were not based on any "contemporary justification" but "rather on vestigial analogies to the law of bailments." (*Ibid.*) Third, guest statutes "were generally thought to be irrational and vestigial." (*Ibid.*) And, fourth, the guest statutes pertained to common law tort actions, in which the courts played a more active role. (*Ibid.*) Accordingly, the Ninth Circuit did not consider *Brown* and *Cooper* particularly apposite. (*In re Paris Air Crash*, at p. 1321.)

15

Three of these reasons apply here. First, MICRA's noneconomic damages cap does not wholly deny compensation to medical malpractice plaintiffs—there is no limitation on the recovery of actual damages (i.e., medical costs and lost wages) and there is only a partial limitation on the recovery of noneconomic damages. Second, MICRA is not based on vestigial analogies to archaic law. And third, while there is significant debate about the wisdom and efficacy of damages caps in controlling medical malpractice insurance costs, it *is* a matter of legitimate debate. (See *Fein, supra,* 38 Cal.3d at pp. 159–161.) Accordingly, MICRA is not afflicted with the peculiar characteristics of the antiquated guest statutes that colored the equal protection analyses in *Brown* and *Cooper*.

We also think it is significant that when the Supreme Court decided *Fein,* the majority disregarded two objections by the dissent which lie at the heart of the equal protection challenge Chan now advances. (See *Fein, supra,* 38 Cal.3d at p. 163 [acknowledging and responding to dissent].) First, the dissent maintained the malpractice insurance crisis was "fading into the past" and therefore the stated rationale for MICRA no longer existed. (*Fein*, at p. 169 (dsn. opn. of Bird, C.J.).) Second, the dissent was concerned inflation would inevitably reduce the value of the fixed $250,000 cap. (*Id.* at p. 171 (dsn. opn. of Bird, C.J.) ["Even this small figure will gradually decline as inflation erodes the real value of the allowable compensation."].) Thus, the very circumstances that underlie Chan's purported "changed circumstances" argument were already emergent and rejected when the court decided *Fein*. Accordingly, we do not view this as a situation where the relevant context is "totally altered."[8] (*Brown, supra,* 8 Cal.3d at

---

[8] Chan also cites to *Calfarm Ins. v. Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247] (*Calfarm*) and *Sonoma County Org. Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296 [152 Cal.Rptr. 903, 591 P.2d 1] (*Sonoma County*). Neither case involved a situation where the challenged enactment survived constitutional scrutiny and was later challenged on the basis of "changed circumstances." In fact, both were writ proceedings filed directly in the Supreme Court seeking immediate review of the challenged provisions. In *Calfarm*, insurers challenged

16

p. 869.)

Nor does the evidentiary showing Chan made demonstrate that the relevant factual premise for MICRA's noneconomic damages cap (and all the other provisions of MICRA) is "totally altered."

Chan insists Proposition 103 insures there will never again be a malpractice insurance "crisis." But this measure does not prohibit rate increases or require low rates. Rather, it provides that insurance rates "shall be maintained at fair levels by requiring insurers to justify all future increases." (Insurance Rates, Regulation, Commissioner, 1988 Cal. Legis. Serv. Prop. 103 (West).) Thus, Proposition 103 focuses on "a fair return" given economic realities, i.e., an insurance company's projected income and losses. (*Fogel v. Farmers Group, Inc.* (2008) 160 Cal.App.4th 1403, 1408 [74 Cal.Rptr.3d 61] (*Fogel*); Cal. Code Regs. tit. 10, §§ 2642.1–2642.3, 2644.2–2644.3.) While Proposition 103 may prevent insurers from unilaterally raising rates without administrative oversight, it does not prohibit rate increases that are fairly related to costs. (See *Fogel, supra,* 160 Cal.App.4th at p. 1408; Cal. Code Regs. tit. 10, §§ 2642.1–2642.3, 2644.2–2644.3.) Proposition 103, then, is concerned with actual costs, but there

Proposition 103 on numerous grounds, including that the mandated insurance rate rollbacks were constitutionally confiscatory, i.e., deprived insurers of a fair return. The court agreed, rejecting the assertion, among others, that the rollbacks could be sustained as temporary emergency measures in the face of rapidly increasing rates. (*Calfarm*, at pp. 816–821 [the "asserted rise in insurance rates . . . is not a temporary problem; it is a long term, chronic situation"].) In *Sonoma County*, labor unions challenged a statute enacted in the wake of Proposition 13 that purported to override for one year collective bargaining agreement cost-of-living provisions. The court held the statute violated the prohibition on impairment of contracts and could not be sustained as a valid exercise of police power in the face of a fiscal emergency. While the state relied on pre-Proposition 13 predictions of local economic disaster, the Legislature had immediately passed bailout legislation, staunching the predicted fiscal emergency and thus eliminating the justification for the impairment statute. (*Sonoma County*, at pp. 309–311 [a law depending on an "emergency" is open to judicial inquiry as to whether the exigency continues to exist].) The circumstances in both *Calfarm* and *Sonoma County* are significantly different than those in the instant case.

17

is nothing in the proposition, itself, that is a check on such costs. Accordingly, the measure provides no assurance medical malpractice rates would stay in check should MICRA's noneconomic damages cap be removed. Curran's actuary, moreover, opined the damages cap has, all along, exerted a downward influence on the cost of medical malpractice insurance and, without the cap, "it would be reasonable to expect increases" in rates.

Chan also has not shown that the underlying circumstances that gave rise to the medical malpractice insurance problem that reached crisis proportions in the 1970's no longer exist. (See *American Bank, supra,* 36 Cal.3d at pp. 371–372 [identifying some of the "[m]any factors" contributing to the "problems" that had arisen "in the medical malpractice field"].) The situation, as we see it, is akin to attacking a rent control ordinance on the ground rents have stabilized—there would no longer be, under Chan's theory, a "crisis" in the rental housing market and thus no justification for rent control. However, the crisis only truly abates if the factors that caused it—i.e., a greater demand for housing than there is supply to meet it—no longer exist. (See *Santa Monica Beach, supra,* 19 Cal.4th at pp. 972–973 [denying a takings challenge to rent control, stating "[t]he modern view is 'that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare' . . . *irrespective of the existence of an emergency*" and asking rhetorically "[h]ow long would a court, or a litigant, have to wait to give the law a 'fair chance' to work before declaring that it is a failure and therefore unconstitutional?"], italics added; *San Remo Hotel v. City And County of San Francisco* (2002) 27 Cal.4th 643, 674 [117 Cal.Rptr.2d 269, 41 P.3d 87] ["[*m*]*aintaining* the availability of" housing supply is a "reasonable means" of addressing San Franciscans' housing needs], italics added.)

In fact, in *American Bank,* the Supreme Court rejected an argument that MICRA's periodic payment provision was unconstitutional because, after passage of the legislation, overall medical costs continued to rise. The court pointed out that the Act was focused

18

on reducing the cost of malpractice insurance and alleviating the myriad problems that caused, not on medical costs overall. It further observed, "indeed, in this respect [insurance costs], statistics suggest that MICRA was in fact successful." (*American Bank, supra*, 36 Cal.3d at p. 373.) The court did not begin to suggest that the Act's apparent success rendered it, at the same time, unconstitutional. Furthermore, the Legislative declared in the preamble to MICRA that the "statutory remedy herein provided is intended to provide an adequate and reasonable remedy within the limits of what the foregoing public health and safety considerations permit now *and into the foreseeable future*." (Stats. 1975, 2d Ex. Sess. 1975–1976, ch. 2, § 12.5, p. 4007, italics added.)

Other than her reliance on Proposition 103, which we have concluded is not the palliative she claims, Chan has not demonstrated that the fundamentals of our health care system and its interface with our tort and insurance systems that gave rise to the declared insurance crisis, no longer exist, rendering MICRA's provisions of no plausible utility. (See *Warden, supra,* 21 Cal.4th at p. 644.) Until such a showing can be made, the debate over the wisdom and efficacy of MICRA's noneconomic damages cap remains within the province of the Legislature and the voters of this state. (See *Salgado, supra,* 19 Cal.4th at p. 649 ["whatever their merits," plaintiff's arguments that periodic payments of future noneconomic damages unfairly deprived him of needed compensation and resources to pay costs and attorney fees, "are more appropriately addressed to the Legislature"]; see also *Quackenbush v. Superior Court* (1997) 60 Cal.App.4th 454, 465–467 [70 Cal.Rptr.2d 271] (*Quackenbush*) [while plaintiff leveled "legitimate criticism[s]" of statute prohibiting drunk and uninsured motorists from recovering any noneconomic damages in negligence actions, any change to the classifications was "a legislative task, not one to be performed by the judiciary"].)

Our view is not altered by the United State's Supreme Court's recent opinion in *Shelby County v. Holder* (2013) __ U.S. __ [133 S.Ct. 2612, 186 L.Ed.2d 651] (*Shelby*

19

*County*), to which Chan also cites. In that case, the Supreme Court, in light of changed circumstances, invalidated the 2006 reauthorization of the Voting Rights Act[9] coverage formula, which incorporated the formula originally enacted in 1965. (*Shelby County*, at pp. 2625–2631.) The court viewed the Act as a "sharp departure" from the constitutional norms dictated by the equal sovereignty of the states and federal government, which had been justified for a number of years only by " 'exceptional conditions.' " (*Id.* at p. 2624.) "Nearly 50 years later," however, "things [had] changed dramatically." While there was "no doubt" voter participation had improved "because" of the Act (*id.* at pp. 2625–2626), this did not make the specifics of the challenged formula "immune" from scrutiny. (*Id.* at p. 2627.) The problem, according to the court, was that the formula was "based on decades-old data and *eradicated* practices"—specifically, low voter turnout in the 1960's and early 1970's and literacy tests that had long been abolished. (*Id.* at p. 2617, italics added.) The court refused to sanction an " 'extraordinary departure from the traditional course of relations between the States and the Federal Government' " (*id.* at p. 2624, quoting *Presley v. Etowah County Comm'n* (1992) 502 U.S. 491, 500–501) on the basis of historic facts that indisputably no longer existed and had "no logical relation to the present day." (*Shelby County, supra*, at p. 2629.)

While there is no doubt MICRA is a significant legislative enactment, it is not a federal law, and does not impact the fundamental constitutional compact between the states and the federal government. Thus, the extreme reticence to infringe on state sovereign power that drove the analysis in *Shelby County* does not drive us here. Rather, MICRA is of the same class as other state statutes controlling the measure and recovery of damages. (See e.g. *Jenkins v. County of Los Angeles* (1999) 74 Cal.App.4th 524, 535–538 [88 Cal.Rptr.2d 149] [upholding § 3333.3, barring felons from recovering any noneconomic damages in negligence cases]; *Quackenbush, supra,* 60 Cal.App.4th at

---

[9] Title 42 United States Code section 197 et seq.

20

pp. 464, 466–467 [upholding § 3333.4, barring drunk drivers and uninsured motorists from recovering any noneconomic damages in negligence case]; see also *Stout v. Turney* (1978) 22 Cal.3d 718, 725–727 [150 Cal.Rptr. 637, 586 P.2d 1228] [discussing evolution of § 3343 and Legislature's decision to adopt the more restrictive "out-of-pocket" measure of damages for real estate fraud]; *Werner v. Southern California Associated Newspapers* (1950) 35 Cal.2d 121, 125–137 [216 P.2d 825] (*Werner*) [upholding § 48 imposing limitations on libel and slander damages and largely limiting recovery to "special damages"]; *Cadlo v. Metalclad Insulation Corp.* (2007) 151 Cal.App.4th 1311, 1318 [61 Cal.Rptr.3d 104] (*Cadlo*) [describing "survival" statute, Code Civ. Proc., § 377.34, barring recovery of pain and suffering damages, as "effectively impos[ing] a limit on the types of recoverable damages when the plaintiff dies before judgment"]; *In re Paris Air Crash, supra,* 622 F.2d at pp. 1322–1324 [upholding California statutes and case law precluding the recovery of punitive damages in wrongful death cases].)

Furthermore, unlike the formula specifics at issue in *Shelby County* that were demonstrably and irrefutably nonexistent when Congress reauthorized the formula in 2006, there is no evidence in the record here that the factors that precipitated the medical malpractice insurance crisis addressed by MICRA no longer exist and the Act in no plausible way continues to advance the Legislature's purpose in enacting it.

Chan observes courts in some other states have ruled damages caps bear no rational relationship to controlling insurance costs. (See *Stinnett*, *supra*, 198 Cal.App.4th at p. 1432, fn. 4 [summarizing cases]; *Estate of McCall v. United States* (Fla. 2014) 134 So.3d 894, 910 (*McCall*) ["Reports have failed to establish a direct correlation between damages caps and reduced malpractice premiums"]; *Arbino v. Johnson & Johnson* (Ohio 2007) 880 N.E.2d 420, 435 [damages caps violated rational basis test "because they imposed the cost of the intended benefit to the public solely upon those most severely injured"].)

However, courts in many other states have upheld damages caps. (See, e.g.,

21

*MacDonald v. City Hospital, Inc.*(2011) 227 W.Va. 707, 720 ["The Legislature could have rationally believed that decreasing the cap on noneconomic damages would reduce rising medical malpractice premiums and, in turn, prevent physicians from leaving the state thereby increasing the quality of, and access to, healthcare for West Virginia residents."]; *Judd v. Drezga* (Utah 2004) 103 P.3d 135, 140–141 ["The legislature's determination that it needed to respond to the perceived medical malpractice crisis was logically followed by action designed to control costs."]; *McCall*, *supra*, 134 So.3d at p. 930 (dsn. opn. of Polston, C.J.) [listing cases].)

Moreover, in *Fein*, the Supreme Court acknowledged some other courts had invalidated damages limitations in medical malpractice cases. (*Fein, supra,* 38 Cal.3d at p. 161.) With one exception, observed the court, these all involved limitations on *both* actual and noneconomic damages. (*Ibid.*) In any event, the court continued, no principle of California or federal constitutional law prohibits the Legislature from "limiting the recovery of damages in a particular setting in order to further a legitimate state interest." (*Ibid.*) We therefore conclude *Fein* remains the controlling authority as to the constitutional validity of MICRA's noneconomic damages cap on equal protection grounds and reject Chan's equal protection challenge to section 3333.2.

**D. *Due Process***

The due process claim that has historically been advanced against MICRA's damages provisions is that the Act curtails or imposes new constraints on what was historically recoverable in medical malpractice actions without providing plaintiffs "an adequate quid pro quo." (*E.g., Fein, supra,* 38 Cal.3d at pp. 157–160 [challenge to noneconomic damages cap]; *American Bank, supra,* 36 Cal.3d at pp. 368–369 [challenge to provisions allowing periodic payment of "future damages" and limiting some of those damages on the plaintiff's death].)

The Supreme Court rejected this argument, explaining " '[it] is well established that a plaintiff has no vested property right in a particular measure of damages, and that

22

the Legislature possesses broad authority to modify the scope and nature of such damages. [Citations.] Since the demise of the substantive due process analysis of *Lochner v. New York* (1905) 198 U.S. 45 [49 L.Ed. 937, 25 S.Ct. 539],[10] it has been clear that the constitutionality of measures affecting such economic rights under the due process clause does not depend on a judicial assessment of the justifications for the legislation or of the wisdom or fairness of the enactment [i.e., the "adequacy" of the quid pro quo]. So long as the measure is rationally related to a legitimate state interest, policy determinations as to the need for, and the desirability of, the enactment are for the Legislature.' (*American Bank, supra*, 36 Cal.3d 359, 368–369.)" (*Fein, supra,* 38 Cal.3d at pp. 157–158, italics omitted.)

The court also pointed out past cases had made "clear that the Legislature retains broad control over the measure, as well as the timing, of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and that the Legislature may expand or limit recoverable damages so long as its action is rationally related to a legitimate state interest. In *Werner*[*, supra*], 35 Cal.2d 121, for example, our court applied the 'rational relationship' standard in dismissing a due process attack on a statute—Civil Code section 48a—which permitted a plaintiff who brought a libel or slander action against a newspaper generally to obtain only 'special damages,' largely eliminating the traditional right to obtain 'general damages' that such a plaintiff had enjoyed before the statute." (*Fein, supra,* 38 Cal.3d at p. 158, italics omitted.)

It was "obvious" to the court that section 3333.2—"by placing a ceiling of $250,000 on the recovery of noneconomic damages—w[as] rationally related to the objective of reducing the costs of malpractice defendants and their insurers." (*Fein, supra*, 38 Cal.3d at p. 159.) The provision was therefore not constitutionally infirm under

---

**10** Overruled as stated in *Ferguson v. Skrupa* (1963) 372 U.S. 726, 730 [10 L.Ed.2d 93, 83 S.Ct. 1028].

23

the due process clause.

It was also "worth noting," said the court, "that in seeking a means of lowering malpractice costs, the Legislature placed no limits whatsoever on a plaintiff's right to recover for all of the economic, pecuniary damages—such as medical expenses or lost earnings—resulting from the injury, but instead confined the statutory limitations to the recovery of noneconomic damages, and—even then—permitted up to a $250,000 award for such damages. Thoughtful jurists and legal scholars have for some time raised serious questions as to the wisdom of awarding damages for pain and suffering in any negligence case, noting, inter alia, the inherent difficulties in placing a monetary value on such losses, the fact that money damages are at best only imperfect compensation for such intangible injuries and that such damages are generally passed on to, and borne by, innocent consumers.[11 (This is fn. 16 in the opinion).] While the general propriety of such damages is, of course, firmly imbedded in our common law jurisprudence (see, e.g., *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892–893 [103 Cal.Rptr. 856, 500 P.2d 880]), no California case of which we are aware has ever suggested that the right to recover for such noneconomic injuries is constitutionally immune from

---

[11] "Justice Traynor, in a dissenting opinion in *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 511 [15 Cal.Rptr. 161, 364 P.2d 337], observed: 'There has been forceful criticism of the rationale for awarding damages for pain and suffering in negligence cases. (Morris, *Liability for Pain and Suffering* (1959) 59 Colum. L.Rev. 476; Plant, *Damages for Pain and Suffering* (1958) 19 Ohio St. L.J. 200; Jaffe, *Damages for Personal Injury: The Impact of Insurance* (1953) 18 Law & Contemp. Probs. 219; Zelermyer, *Damages for Pain and Suffering* (1954–1955) 6 Syracuse L.Rev. 27.) Such damages originated under primitive law as a means of punishing wrongdoers and assuaging the feelings of those who had been wronged. [Citations.] They become increasingly anomalous as emphasis shifts in a mechanized society from ad hoc punishment to orderly distribution of losses through insurance and the price of goods or of transportation. Ultimately such losses are borne by a public free of fault as part of the price for the benefits of mechanization. [Citations.] [¶] Nonetheless, this state has long recognized pain and suffering as elements of damages in negligence cases [citations]; *any change in this regard must await reexamination of the problem by the Legislature*.' "

legislative limitation or revision." (*Fein, supra,* 38 Cal.3d at pp. 159–160, italics omitted.)

In this case, Chan is advancing a different due process argument—one grounded on the "right of access to the courts for all persons." (*Payne v. Superior Court* (1976) 17 Cal.3d 908, 914 & fn. 3 [132 Cal.Rptr. 405, 553 P.2d 565] (*Payne*).) Chan's theory in this regard is as follows: Medical malpractice claims cannot realistically be pursued without legal representation. Attorneys almost always take medical malpractice cases on a contingency fee basis. In many cases, as in the instant one, the largest component of the verdict is noneconomic damages. Thus, the noneconomic damages verdict is the most significant monetary pool for attorney fees. In today's dollars, however, $250,000 does not yield enough in contingency fees to make prosecuting most medical malpractice claims economically feasible, effectively denying most malpractice victims access to the courts.

This is essentially the same due process argument that was advanced in *Roa, supra,* 37 Cal.3d at pages 925–929, one of the panoply of cases, along with *Fein* and *American Bank*, initially challenging MICRA. *Roa*, however, involved a challenge to MICRA's *attorney fees provision* limiting contingency percentages (Bus. & Prof. Code, § 6146), not to the Act's damages provisions. Even assuming statutory fee limitations are generally permissible (the Supreme Court pointed out in *Roa* the law is replete with statutory limitations on fee recoveries (*Roa*, at p. 927)), the plaintiffs maintained MICRA's contingency restrictions resulted in fees "so low that in practice the statute will make it impossible for injured persons to retain an attorney to represent them." (*Roa*, at p. 928.) Because the plaintiffs made no showing that was true and because the MICRA limitations were in line with other statutory contingency limits, the court concluded the fee statute was not "unconstitutional on its face." (*Roa*, at p. 928.)

Our initial concern with Chan's due process argument, seemingly borrowed from *Roa* which involved MICRA's contingency fee statute, is that it is misdirected in the

25

context of a challenge to one of MICRA's *damages* statutes.  What Chan insists is constitutionally required is that noneconomic damages be potentially sufficient to cover attorney fees.  This is difficult to reconcile with the fact California ascribes to the "American Rule" under which parties must bear their own attorney fees unless a statute or contract expressly provides for such.  (See *Salgado, supra,* 19 Cal.4th at p. 651.) Indeed, in *Salgado,* the Supreme Court reversed a malpractice judgment that, among other things, attempted to lessen the impact of the noneconomic damages cap by requiring the defendant to pay the plaintiff's attorney fees.  (*Ibid.*)  The court also rejected the argument MICRA's periodic payment provision is flawed because a lump-sum award allows for the payment of attorney fees and court costs.  (*Id.* at p. 648.) "Plaintiff's arguments, whatever their merits, are more appropriately addressed to the Legislature."  (*Id.* at p. 649.)

Chan's position is also difficult to reconcile with the fact there is a sharp demarcation in the law between damages and costs incurred in brining suit, including attorney fees.  (See Code Civ. Proc., § 1033.5.)  Damages, including noneconomic damages, are specifically defined in California law and do not include the attorney fees incurred in prosecuting the lawsuit to recover them.  (See generally Civ. Code, §§ 3281 et seq., 3300 et seq., 3333 et seq.; see also Code Civ. Proc., § 1021 ["Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to their costs, as hereinafter provided."]; *Simke, Chodos, Silberfeld & Anteau, Inc. v. Athans* (2011) 195 Cal.App.4th 1275, 1288 [128 Cal.Rptr.3d 95] ["Generally, damages do not include attorney fees incurred and sought in the present litigation . . . ."]; CACI Nos. 3902–3922 [describing types of damages], 3964 [instructing jury not to award attorney fees as damages].)

Accordingly, in spelling out a measure of damages, or in limiting or excluding certain types of damages, we are hard pressed to see why the Legislature must, as a

26

matter of constitutional due process, take into account the recovery of attorney fees. Indeed, the ramifications of such a mandate would be startling, given the number of contexts in which recoverable damages have been limited. (See, e.g., *Fein*, *supra*, 38 Cal.3d at pp. 157–158 [discussing cases involving limits on recoverable damages and explaining there is no vested right in particular measure of damages]; *Werner, supra,* 35 Cal.2d at pp. 125–137; *Cadlo, supra,* 151 Cal.App.4th at p. 1318; *Jenkins, supra,* 74 Cal.App.4th at pp. 535–538; *Quackenbush, supra,* 60 Cal.App.4th at pp. 464, 466–467; *In re Paris Air Crash, supra,* 622 F.2d at pp. 1322–1324.) The Legislature, moreover, could only guess at what reasonable attorney fees might be in prosecuting a case in any given context, not to mention would need to be prescient about inflationary pressures.

We suspect that is why no case cited by the parties has ever suggested the constitutionality of a *damages* statute depends, in part, on whether it allows for a recovery sufficient to cover reasonable attorney fees. Moreover, the only case of which we are aware that has addressed such an argument dismissed it out of hand. (*Quackenbush, supra,* 60 Cal.App.4th at p. 468 ["[a]t most," plaintiff's denial of access argument "casts doubt on the wisdom of the measure, not its constitutionality"].)

We also cannot reconcile Chan's argument with the general rule that there "is no due process right to counsel in civil cases." (*Walker v. State Bar* (1989) 49 Cal.3d 1107, 1116 [264 Cal.Rptr. 825, 783 P.2d 184] (*Walker*); *People v. Madeyski* (2001) 94 Cal.App.4th 659, 662 [115 Cal.Rptr.2d 14]; see also *Jara v. Municipal Court* (1978) 21 Cal.3d 181, 184 [145 Cal.Rptr. 847, 578 P.2d 94] [indigent civil litigants do not have right to language interpreters at public expense and noting "cases have refused to require counties to provide indigent civil litigants with counsel or with appellate transcripts"]; *Iraheta v. Superior Court* (1999) 70 Cal.App.4th 1500, 1508 [83 Cal.Rptr.2d 471] ["the right to counsel has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation"]; *County of Fresno v. Superior Court* (1978)

27

82 Cal.App.3d 191, 195 [146 Cal.Rptr. 880] ["our independent review of the authorities in this and other states has failed to turn up a single case wherein a court has held that an indigent civil litigant is entitled to court appointed counsel at public expense"].)[12]

Chan's reliance on *Boddie v. Connecticut* (1971) 401 U.S. 371 [28 L.Ed.2d 113, 91 S.Ct. 780] (*Boddie*), is misplaced.  In *Boddie*, the United States Supreme Court held indigents could not be forced to pay a state court filing fee in order to dissolve their marriage.  Given the state's monopoly on granting divorce through a judicial proceeding, such a proceeding became "the only effective means of resolving the dispute at hand and denial of a defendant's full access to that process raises grave problems for its legitimacy."  (*Id.* at p. 376.)  The court went on to emphasize, however, that its conclusion regarding divorce was *not* a holding "that access for all individuals to the courts is a right that is, in all circumstances, guaranteed by" due process.  (*Id.* at pp. 382–383.)  Rather, a divorce proceeding is uniquely "the exclusive precondition to the adjustment of a fundamental human relationship."  (*Ibid.*)

---

[12]  In *Roa*, the court stated "[a]lthough the right to be represented by retained counsel in civil actions is not expressly enumerated in the federal or state Constitution, our cases have long recognized that the constitutional due process guarantee does embrace such a right," citing *Powell v. Alabama* (1932) 287 U.S. 45, 68–69 [77 L.Ed. 158, 53 S.Ct. 55] (*Powell*) and *Mendoza v. Small Claims Court* (1958) 49 Cal.2d 668, 673 [321 P.2d 9] (*Mendoza*).  (*Roa, supra,* 37 Cal.3d at pp. 925–926.)  *Powell* held a criminal defendant is entitled, as a matter of due process, to time to secure counsel of choice.  What the United States Supreme Court said specifically about the right to counsel in criminal and civil cases is:  "If in any case . . . a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense."  (*Powell,* at p. 69.)  In *Mendoza*, the California Supreme Court held the small claims system violated due process to the extent it flatly prohibited litigants from appearing through counsel.  (*Mendoza,* at pp. 673–674.)  Neither case pronounced a constitutional right to representation in civil cases.  Thus, *Roa* must be read as recognizing the right to appear by counsel, if counsel is retained, but not as establishing a constitutional entitlement to counsel in civil cases.  (See *Walker, supra,* 49 Cal.3d at p. 1116.)

In contrast, in *United States v. Kras* (1973) 409 U.S. 434, 434 [34 L.Ed.2d 626, 93 S.Ct. 631] (*Kras*), the Supreme Court upheld a requirement that those seeking bankruptcy protection, including an indigent debtor, must pay a filing fee (which bears a rational basis to having the bankruptcy court system sustained by those who use it). (*Id.* at pp. 444–448.) "Kras' alleged interest in the elimination of his debt burden, and in obtaining his desired new start in life, although important and so recognized by the enactment of the Bankruptcy Act, does not rise to the same constitutional level" as the marriage interests in *Boddie*. (*Kras*, at p. 445.) "If Kras is not discharged in bankruptcy, his position will not be materially altered in any constitutional sense. Gaining or not gaining a discharge will effect no change with respect to basic necessities." (*Ibid.*) Not only did the Supreme Court view Kras' economic interest in a bankruptcy discharge as not fundamental, it also concluded the government lacked a monopoly "over the establishment, enforcement, or dissolution of debts." (*Ibid.*) "In contrast with divorce, bankruptcy is not the only method available to a debtor for the adjustment of his legal relationship with his creditors. The utter exclusiveness of court access and court remedy . . . was a potent factor in *Boddie*. But '[w]ithout a prior judicial imprimatur, individuals may freely enter into and rescind commercial contracts.' " (*Ibid.*) "However unrealistic the remedy may be in a particular situation, a debtor, in theory, and often in actuality, may adjust his debts by negotiated agreement with his creditors. . . . Government's role with respect to the private commercial relationship is qualitatively and quantitatively different from its role in the establishment, enforcement, and dissolution of marriage." (*Id.* at pp. 445–446.)

The California Supreme Court examined *Boddie* and *Kras* in *Payne, supra*, 17 Cal.3d 908, in which a prisoner sought to defend a civil suit for damages. He was unable to obtain counsel and, due to his incarceration, could not personally attend court proceedings. As a result, he suffered a default judgment. (*Id.* at pp. 911–912.) The court vacated the default, concluding that if the defendant were found indigent, he had a right

29

to meaningful court access, either by appointment of counsel or by a continuance until he was free to defend the action himself.  (*Id.* at pp. 912, 923–924.)  The court reasoned that to defend his property rights, the prisoner had no alternative to the judicial forum into which he had been thrust, and his status as a prisoner foreclosed him from access, via personal appearance or by counsel.  (*Id.* at pp. 917–918.)  The court emphasized it was not ruling "that all indigents have a right to counsel in civil cases" or establishing "that indigent prisoners who are plaintiffs in civil actions may secure appointed counsel or the right to appear personally."  (*Id.* at pp. 926–927.)

Thus, while MICRA's noneconomic damages cap may well influence an attorney's decision to take or reject a medical malpractice case on contingency, the cap does not violate a due process right to court access.  While causes of action for negligently caused injury or death serve important public interests, no fundamental constitutional interest akin to that in *Boddie* underlies these tort actions for money damages.  (See *Kras, supra,* 409 U.S. at p. 445; *Brown*, *supra*, 8 Cal.3d at p. 862, fn. 2 [declining to apply strict scrutiny to "guest" statute precluding passengers from suing negligent drivers because "right to sue for negligently inflicted injuries is [not] a 'fundamental interest' "].)  And unlike in *Boddie*, MICRA's damages cap does not invariably close the courthouse doors to malpractice plaintiffs.  Even assuming it diminishes the number of cases taken by lawyers on contingency, it does not prevent individuals from pursuing their own cases, hiring an attorney on an hourly basis, or seeking pro bono legal assistance.  (See *Kras, supra,* 409 U.S. at pp. 445–446; *Payne*, *supra*, 17 Cal.3d at pp. 923–924; *Walker*, *supra*, 49 Cal.3d at p. 1116; *Cornett v. Donovan* (1995) 51 F.3d 894, 899.)  A malpractice victim may also negotiate a resolution of his or her claim, even if that may prove difficult.  (See *Kras*, *supra,* 409 U.S. at pp. 445–446.)

Chan also notes that in 2009, the Legislature enacted legal aid legislation recognizing the "critical need for legal representation in civil cases."  (Stats 2009, Reg.

Sess. 2009, ch. 457, § 1(b), p. 4491.)  This legislation does not, however, mandate counsel in every civil case, let alone every medical malpractice case.  Instead, it encourages *pro bono* representation and requires, subject to funding, pilot programs in certain courts to appoint counsel to represent "low-income parties in civil matters involving critical issues affecting basic human needs."  (2009 Stats., ch. 457, Legis. Counsel Digest.)  Moreover, medical malpractice is not among the enumerated "needs." (Gov. Code, § 68651, subd. (b)(1) [cases for pilot would be "housing-related matters, domestic violence and civil harassment restraining orders, probate conservatorships, guardianships of the person, elder abuse, or actions by a parent to obtain sole legal or physical custody of a child"].)  Thus, far from establishing a right to counsel for medical malpractice plaintiffs, the 2009 law illustrates just how significantly California law would need to change to recognize universal representation of civil litigants.

In sum, we conclude Chan's due process argument—predicated on the assertion recoverable noneconomic damages are insufficient to cover reasonable attorney fees— cannot be reconciled with established constitutional principles.

## E.  *Right to Jury Trial*

Chan lastly contends the reduction of a damages award pursuant to MICRA's noneconomic damages cap interferes with her right to trial by jury.  (See Cal. Const., art. I, § 16 ["Trial by jury is an inviolate right and shall be secured to all . . . ."].)

In California, the right to a jury trial applies in any action in which the parties would have had the right to a jury trial under the common law as it existed in 1850, when the California Constitution was adopted.  (*People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 286–287 [231 P.2d 832]; *Hung v. Wang* (1992) 8 Cal.App.4th 908, 927 [11 Cal.Rptr.2d 113] (*Hung*), partially superseded by statute as stated in *Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 396 [102 Cal.Rptr.2d 125].)  However, the scope of the right is not immutable, even as to rights that existed at common law.  (See *American Bank, supra,* 36 Cal.3d at p. 375 [the state constitutional right to jury trial " ' "does not

31

require adherence to the letter of common law practice" ' "]; *Hung,* at p. 927 ["It is not a static right."].)

Thus, in *American Bank,* the Supreme Court rejected a variation of the right to jury trial argument Chan makes here. In that case, the plaintiff challenged MICRA's provision for periodic payments (Code Civ. Proc., § 667.7), which not only requires the trial court to establish a payment schedule for "future damages" over $50,000, if requested by either party, but further provides that periodic payments for future damages other than for lost income cease on the death of the plaintiff. (*Id.*, subds. (a)–(c).) Pointing out that under the common law, a malpractice plaintiff receives a full, lump sum payment, the plaintiff in *American Bank* claimed her right to jury trial was impaired by the requirement that the trial court establish a periodic payment schedule. (*American Bank, supra,* 36 Cal.3d at pp. 374–375.) The Supreme Court concluded that as long as the jury was the finder of fact as to the amount of future damages, the directive that the trial court fix the periodic payment schedule did not infringe on the right to jury trial. (*Id.* at pp. 376–377.) And while the court pointed out several times that MICRA limits periodic payments on the plaintiffs' death, the court did not even remotely suggest this legislative proscription compromised the right to jury trial. (*American Bank*, at pp. 366, 374–378 & fn. 14.)

The court reaffirmed its holding in *American Bank* in *Salgado.* (*Salgado, supra,* 19 Cal.4th at pp. 649.) In *Salgado,* the jury, following the procedures suggested in *American Bank*, returned special verdicts as to the character of the future damages (which included $550,000 in noneconomic damages) and also determined the present value of future medical expenses. (*Salgado*, at p. 637.) The court held the damages cap applies whether noneconomic damages are paid in a lump sum or over time through periodic payments. But to insure parity, periodic payments must return to the plaintiff the equivalent of a prudently invested lump-sum payment. (*Id.* at pp. 640–641.)

In discussing the noneconomic damages cap, the court explained it "places no

32

limit on the amount of injury sustained by the plaintiff, as assessed by the trier fact, but only on the amount of the defendant's liability therefor." (*Salgado, supra*, 19 Cal.4th at p. 640.)  Thus, the cap is "not a legislative attempt to estimate the true damages suffered by plaintiffs"—that being the province of the jury—"but rather an attempt to control and reduce medical malpractice insurance costs by placing a predictable, uniform limit on the defendant's liability for noneconomic damages." (*Id.* at p. 641.)  The court went on to expressly reject arguments that having juries determine the present value of future noneconomic damages, with trial courts thereafter applying the MICRA cap and establishing periodic payment schedules, violates the right to jury trial. (*Salgado*, at pp. 647–649.)[13]

Indeed, Chan's contention that the damages cap violates the right to jury trial "is but an indirect attack upon the Legislature's power to place a cap on damages." (*Yates v. Pollock* (1987) 194 Cal.App.3d 195, 200 [239 Cal.Rptr. 383] (*Yates*).)  Yet, as we have discussed, our Supreme Court has *repeatedly* held "the Legislature retains broad control over the measure, as well as the timing, of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and that [it] may expand or limit recoverable damages so long as its action is rationally related to a legitimate state interest." (*Fein, supra,* 38 Cal.3d at p. 158, italics omitted.)  And as to noneconomic damages, specifically, the court has observed no California case "has ever suggested that the right to recover for such noneconomic injuries is constitutionally immune from legislative

---

[13] The United States Supreme Court has similarly observed:  "While we have not specifically addressed the issue, courts of appeals have held that district court application of state statutory caps in diversity cases, postverdict, does not violate the Seventh Amendment.  See *Davis v. Omitowoju*, 883 F.2d 1155, 1161–1165 (CA3 1989) (Reexamination Clause of Seventh Amendment does not impede federal court's postverdict application of statutory cap); *Boyd v. Bulala*, 877 F.2d 1191, 1196 (CA4 1989) (postverdict application of statutory cap does not violate Seventh Amendment right of trial by jury)." (*Gasperini v. Center for Humanities, Inc.* (1996) 518 U.S. 415, 429, fn. 9 [135 L.Ed.2d 659, 116 S.Ct. 2211].)

limitation or revision." (*Id.* at pp. 159–160.)

We cannot square Chan's assertion that MICRA's limitation on noneconomic damages violates the right to jury trial, with the Supreme Court's explicit holdings that the Legislature is empowered to set the measure and amount of recoverable damages.[14] We therefore join the other courts of appeal that have considered and rejected the right to jury trial challenge to MICRA's noneconomic damages cap Chan makes here. (*Stinnett*, *supra*, 198 Cal.App.4th at p. 1433; *Yates, supra,* 194 Cal.App.3d at p. 200.)

As she does in connection with her equal protection argument, Chan claims "changed circumstances" should lead to a different result here as to her denial of jury trial argument. But our conclusion—that MICRA's damages cap is a legal limitation on recoverable damages and does not impair the jury's factfinding role—does not hinge on whether the Act has a continued rationale. Moreover, to the extent Chan's jury trial changed circumstances argument is a reprise of her equal protection changed circumstances argument, we have already addressed it.

### III. DISPOSITION

The judgment is affirmed. Costs on appeal to respondent.

---

[14] Nor does *Jehl v. Southern Pac. Co.* (1967) 66 Cal.2d 821 [59 Cal.Rptr. 276, 427 P.2d 988], advance Chan's right to jury trial argument. In that case, the Supreme Court held conditionally granting a new trial unless the defendant accepts an *additur* does not impair the right to jury trial—and that is so even though *additur* reflects a factual finding by the trial court. (*Id.* at pp. 828–833 [additur "should not be treated differently from other modern devices aimed at making the relationship between judge and jury as to damages as well as to other matters, one that preserves the essentials of the right to jury trial without shackling modern procedure to outmoded precedents"], fn. omitted.) MICRA's noneconomic damages cap, in contrast, is not even a species of factfinding, but a legislative limitation on damages marking the legal boundaries of liability. (See *Salgado, supra,* 19 Cal.4th at p. 641; *American Bank, supra,* 36 Cal.3d at p. 363 [MICRA revised numerous "legal rules" applicable to medical malpractice actions].)

_____
Banke, J.


We concur:


_____
Humes, P. J.


_____
Margulies, J.

Trial Judge: Honorable Wallace P. Douglass

Trial Court: San Francisco City and County Superior Court

The Dolan Law Firm, Christopher B. Dolan, Mary C. Barnes; Smith & McGinty, Daniel U. Smith and Valerie T. McGinty for Plaintiffs and Appellants.

Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza, Cassidy C. Davenport; Donnelly Nelson Depolo & Murray and Thomas J. Donnelly for Defendant and Respondent.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Respondent.

Tucker Ellis, Rebecca A. Lefler and Lauren H. Bragin for California Medical Association, California Dental Association, California Hospital Association and American Medical Association as Amici Curiae on behalf of Defendant and Respondent.